**DUANE MORRIS LLP**
D. Stuart Bartow (SBN 233107)
Email: DSBartow@duanemorris.com
Nicole E. Grigg (SBN 307733)
Email: NEGrigg@duanemorris.com
2475 Hanover Street
Palo Alto, CA 94304-1194
Tel.: 650.847.4150
Fax: 650.847.4151

**DUANE MORRIS LLP**
Joseph A. Powers
Admitted *Pro Hac Vice*
japowers@duanemorris.com
Jarrad M. Gunther
Admitted *Pro Hac Vice*
jmgunther@duanemorris.com
30 South 17th Street
Philadelphia, PA 19103
Telephone: 215.979.1000
Facsimile: 215.979.1020

*Attorneys for Defendant*
SONICWALL INC.

**DUANE MORRIS LLP**
Matthew C. Gaudet
Admitted *Pro Hac Vice*
mcgaudet@duanemorris.com
Robin L. McGrath
Admitted *Pro Hac Vice*
rlmcgrath@duanemorris.com
David C. Dotson
Admitted *Pro Hac Vice*
dcdotson@duanemorris.com
Jennifer H. Forte
Admitted *Pro Hac Vice*
jhforte@duanemorris.com
1075 Peachtree Street, Ste. 2000
Atlanta, GA 30309
Telephone: 404.253.6900
Facsimile: 404.253.6901

(Complete list of counsel for Defendant
on signature page)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| FINJAN LLC., a Delaware Limited Liability Company,<br><br>         Plaintiff,<br><br> vs.<br><br>SONICWALL, INC., a Delaware Corporation<br><br>         Defendant. | Case No. 5:17-cv-04467-BLF (VKD)<br><br>**DEFENDANT SONICWALL INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:   January 14, 2021<br>Time:   9:00 AM<br>Courtroom: 3, 5th Floor<br>Judge:   Hon. Beth Labson Freeman |

**REDACTED**

# **TABLE OF CONTENTS**

**Page**

I.   NON-INFRINGEMENT OF THE '154 PATENT ..............................................................1

    A.   Background of the '154 Patent ................................................................... 1

    B.   The '154 Accused Products Do Not Infringe the '154 Patent ................................ 2

        1.   Literal Infringement ..................................................................... 2

            a.   The Operation of the '154 Accused Products ..................................2

            b.   Finjan's Expert Testimony Cannot Avoid Summary Judgment ......3

            c.   Finjan's "URL Rewriting" Theory ...................................5

        2.   Doctrine of Equivalents .................................................................. 6

II.   THE COMBINATION OF SONICWALL'S EMAIL SECURITY PRODUCTS AND
CAPTURE ATP CANNOT INFRINGE THE '844, '494, AND '926 PATENTS ............6

    A.   The '844, '494, and '926 Patents Expired in January 2017 .................................... 6

    B.   Capture ATP Was Not Commercially Available for Use With SonicWall's
Email Security Products Until February 2017 ......................................................... 7

    C.   The Only Accused Sandbox in this Case is in Capture ATP ................................. 7

III.   SONICWALL GATEWAYS DO NOT RECEIVE "DOWNLOADABLES" ...................8

IV.   NON-INFRINGEMENT OF '633 AND '822 PATENTS ................................................10

    A.   Background of the '633 and '822 Patents ............................................................. 10

    B.   Capture ATP Does Not Use or Transmit MPC ('633 Patent, Claims 1, 8 and
14; '822 Patent, Claim 9) ....................................................................................... 10

        1.   Literal Infringement ................................................................... 10

        2.   Doctrine of Equivalents ............................................................... 11

    C.   Finjan Accuses Combinations in Name Only of Infringing '633 Patent, Claim
14 ........................................................................................................................... 12

V.   NON-INFRINGEMENT BASED ON SAME COMPUTER ('305 AND '408
PATENTS) .....................................................................................................................13

    A.   The '408 Patent ...................................................................................................... 13

    B.   The '305 Patent ...................................................................................................... 15

i

VI.  NON-INFRINGEMENT OF THE '926 PATENT ................................................................16

VII.  NON-INFRINGEMENT '305 PATENT ..........................................................................19

VIII.  DAMAGES..........................................................................................................................20

    A.  Finjan Is Not Entitled to a Royalty on SonicWall's Non-U.S. Sales.................... 20

    B.  Finjan Is Not Entitled to Damages Prior to Actual Notice of Infringement ......... 22

        1.  The '926 Patent ......................................................................................... 23

        2.  The '968 Patent, 822 Patent, 780 Patent, and 844 Patent ......................... 23

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Akzo Nobel Coatings, Inc. v. Dow Chemical Co.*
5
    811 F.3d. 1334 (Fed. Cir. 2016)............................................................................12

6

*Amsted Indus. Inc. v. Buckeye Steel Castings Co.*
    24 F.3d 178 (Fed. Cir. 1994)...............................................................................23
7

8

*Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*
    876 F.3d 1350 (Fed. Cir. 2017)...........................................................................22

9

*Centillion Data Sys. v. Qwest Commc'ns Int'l, Inc.*
10
    631 F.3d 1279 (Fed. Cir. 2011)....................................................................... 21-22

11

*Daewoo Elecs. Corp v. Funai*
    616 F.3d 1357 at 3173 (Fed. Cir. 2010)...............................................................23
12

13

*Finjan v. Eset*
    LLC, 17-cv-183-CAB-BGS, Dkt. 699 (S.D. Cal. Oct. 16, 2019)..............................23

14

*Finjan, Inc. v. Juniper Nets., Inc.*
15
    2019 U.S. App. LEXIS 32118 (Fed. Cir. Oct. 9, 2019).............................................5

16

*Finjan, Inc. v. Juniper Nets., Inc.*
    2019 U.S. Dist. LEXIS 122762 (N.D. Cal. July 23, 2019).......................................4-5
17

18

*Finjan, Inc. v. Juniper Nets., Inc.*
    387 F.Supp.3d 1004 (N.D. Cal. 2019) ..............................................................4-5, 23

19

*Int. Ventures I LLC v. Motorola Mob. LLC*
20
    870 F.3d 1320 (Fed. Cir. 2017)...........................................................................21

21

*Maxwell v. J. Baker, Inc.*
    86 F.3d 1098 (Fed. Cir. 1996)............................................................................22
22

23

*Microsoft Corp. v. AT&T Corp.*
    550 U.S. 437 (2007).........................................................................................22

24

*NTP, Inc. v. Research in Motion, Ltd.*
    418 F.3d 1282 (Fed. Cir. 2005)...........................................................................22
25

26

*Palo Alto Nets, Inc. v. Finjan, Inc.*
    752 F. App'x 1017 (Fed. Cir. 2018) .....................................................................1

27

*Pharmastem Therapeutics, Inc. v. Viacell, Inc.*
28
    491 F.3d 1342, 1349 (Fed. Cir. 2007)..................................................................17

iii

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l., Inc.*
    711 F.3d 1348 (Fed. Cir. 2013)...................................................................................... 20-21

*Warner-Jenkinson v. Hilton Davis Chem. Co.*
    520 U.S. 17 (1997)...................................................................................................12, 18

**Statutes**

35 U.S.C. § 154..................................................................................................................6

35 U.S.C. § 271(a) ....................................................................................................... 21-22

35 U.S.C. § 287(a) ..............................................................................................................22

# TABLE OF ABBREVIATIONS

| Detailed Name | Abbreviation |
|---|---|
| Plaintiff Finjan, LLC | Finjan or Plaintiff |
| Defendants SonicWall, Inc. | SonicWall or Defendant |
| U.S. Patent No. 7,647,633 | '633 Patent |
| U.S. Patent No. 7,058,822 | '822 Patent |
| U.S. Patent No. 6,804,780 | '780 Patent |
| U.S. Patent No. 8,141,154 | '154 Patent |
| U.S. Patent No. 6,154,844 | '844 Patent |
| U.S. Patent No. 8,677,494 | '494 Patent |
| U.S. Patent No. 7,613,926 | '926 Patent |
| U.S. Patent No. 7,975,305 | '305 Patent |
| U.S. Patent No. 8,225,408 | '408 Patent |
| U.S. Patent No. 6,965,968 | '968 Patent |
| Mobile Protection Code | MPC |
| "information-destination of the downloadable" / "downloadable-information destination" | Information-Destination |
| 1.    SonicWall's Gateways<br><br>2.    SonicWall Email Security products<br><br>3.    Capture ATP<br><br>4.    Gateways + Capture ATP<br><br>5.    Email Security + Capture ATP<br><br>6.    Capture Client + Capture ATP<br><br>7.    Gateways + WXA | Accused Products or Accused Systems |
| Gateways<br><br>Capture ATP<br><br>Gateways + Capture ATP<br><br>Capture Client + Capture ATP<br><br>Email Security products<br><br>Email Security products + Capture ATP | '154 Accused Products[1] |

---

[1] In its Opposition to SonicWall's recently filed motion to strike Finjan's "Gateway alone" and "ESA alone" theories, Finjan represented that those "alone" theories likewise require Capture ATP. Dkt. 313 at 7-9.

| Detailed Name | Abbreviation |
|---|---|
| Email Security products, including Email Security Appliances and Cloud Email Security | ES products |
| WAN Acceleration Appliance | WXA |
| Content Filtering Service | CFS |
| Reassembly-free deep packet inspection | RFDPI |
| Doctrine of Equivalents | DOE |
| October 22, 2020 Deposition Transcript of Dr. Eric Cole | Cole Dep. or Ex. 14[2] |
| October 26, 2020 Deposition Transcript of Dr. Michael Mitzenmacher | Mitz. Dep. or Ex. 15 |
| October 29, 2020 Deposition Transcript of Dr. Nenad Medvidović | Med. Dep. or Ex. 16 |
| Expert Report of Dr. Eric Cole Regarding Technology Tutorial and Infringement by SonicWall, Inc. of Patent Nos. 6,154,844; 7,058,822; 7,647,633; and 8,677,494 | Cole Report or Ex. 17 |
| Expert Report of Michael Mitzenmacher, Ph.D. Regarding Infringement by SonicWall, Inc. of Patent Nos. 6,804,780; 6,965,968; and 7,613,926 | Mitz. Report or Ex. 18 |
| Expert Report of Dr. Nenad Medvidović Regarding Infringement by SonicWall, Inc. of Patent Nos. 8,225,408; 7,975,305; and 8,141,154 | Med. Report or Ex. 3 |
| Expert Report of DeForest McDuff, Ph.D. | McDuff Report or Ex. 4 |
| Declaration of John Gmuender | Gmuender Decl. |
| Plaintiff Finjan, Inc.'s Third Supplemental Disclosure of Asserted Claims and Infringement Contentions and Document Production Pursuant to Patent Local Rules 3-1 and 3-2 | Operative Contentions |
| July 9, 2020 Deposition Transcript of Mr. John Gmuender | Gmuender Dep. or Ex. 5 |
| July 16, 2020 Deposition Transcript of Mr. Shunhui Zhu | Zhu Dep. or Ex. 6 |
| July 29, 2020 Deposition Transcript of Mr. Dmitriy Ayrapetov | Ayrapetov Dep. or Ex. 7 |

---

[2] Unless otherwise noted, all exhibits referenced herein as "Ex. __" are attached to the Declaration of Jarrad M. Gunther In Support of Defendant SonicWall Inc.'s Motion for Summary Judgment.

| Detailed Name | Abbreviation |
| --- | --- |
| July 24, 2020 Deposition Transcript of Mr. Matthew Neiderman | Neiderman Dep. or Ex. 8 |
| July 31, 2020 Deposition Transcript of Mr. Alex Dubrovsky | Dubrovsky Dep. or Ex. 21 |
| July 7, 2020 Deposition Transcript of Mr. Senthil Cheetancheri | Cheetancheri Dep. or Ex. 24 |
| November 10, 2020 Deposition Transcript of Dr. Alessandro Orso | Orso Dep. or Ex. 40 |
| Transcript of the Proceedings of the Official Electronic Sound Recording of January 28, 2020 Hearing | 1.28.2020 Hearing or Ex. 23 |
| *Finjan, Inc. v. Cisco Systems, Inc.*, Case No. 17-cv-00072-BLF | *Cisco* |
| *Finjan, Inc. v. Cisco Systems, Inc.*, Case No. 17-cv-00072-BLF (N.D. Cal. March 30, 2020), Dkt. No. 499 | Cisco MSJ Order or Ex. 1 |
| *Finjan, Inc. v. Cisco Systems, Inc.*, Case No. 17-cv-00072-BLF (N.D. Cal. July 23, 2018), Dkt. No. 134 | Cisco Markman Order or Ex. 2 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:**

**PLEASE TAKE NOTICE** that on January 14, 2021 at 9:00 AM in Courtroom 3, 5th Floor, in the United States District Court for the Northern District of California, San Jose Courthouse, located at 280 S. 1st St, San Jose, CA 95113, Defendant SonicWall Inc. ("SonicWall") will and hereby does move the Court for summary judgment against Plaintiff Finjan, LLC on the grounds outlined in its Memorandum of Points and Authorities below.

Specifically, SonicWall seeks an order that:

- SonicWall does not infringe claim 1 of U.S. Patent No. 8,141,154

- The combination of SonicWall's Email Security products and Capture ATP cannot infringe the asserted claims of U.S. Patent Nos. 6,154,844; 8,677,494; and 7,613,926

- SonicWall Gateways do not receive "Downloadables" and therefore cannot infringe the asserted claims 10 and 14 of U.S. Patent No. 8,677,494, claims 41 and 43 of U.S. Patent No. 6,154,844, and the asserted claim of U.S. Patent No. 6,804,780 Patent

- SonicWall does not infringe the asserted claims U.S. Patent Nos. 7,647,633 and U.S. Patent No. 7,058,822

- SonicWall does not infringe the asserted claims U.S. Patent Nos. 7,975,305 and 8,225,408 based on a combination of separate, remote computers

- SonicWall does not infringe the asserted claims of U.S. Patent No. 7,613,926

- SonicWall does not infringe the asserted claims of U.S. Patent No. 7,975,305

- Finjan is not entitled to a royalty on SonicWall's Non-U.S. Sales

- Finjan is not entitled to damages prior to actual notice of infringement of U.S. Patent Nos. 7,613,926; 6,965,968; 6,154,844; 7,058,822; and 6,804,780 patents

This motion is supported by the following Memorandum of Points and Authorities, the Declaration of Jarrad M. Gunther and all supporting exhibits attached, the Declaration of John Gmuender and all supporting exhibits attached, and on such other written or oral argument as may be presented at or before the time this motion is heard by the Court.

SonicWall hereby moves for partial summary judgment on the seven grounds below.

## I.      NON-INFRINGEMENT OF THE '154 PATENT

The '154 non-infringement issue here is similar to the issue on which this Court granted summary judgment in *Finjan v. Cisco* regarding the Cisco "AMP" products. Ex. 1 (Cisco MSJ Order) at 6-11. Specifically, Finjan has not identified a "call to a first function" within the content received by the Accused Products. The Parties here stipulated to the same constructions for "first function" and "second function" from *Cisco*, namely, the "first function" is the substitute function, and the "second function" is the original function, which is different than the first function. Dkt. 214; Ex. 2 (Cisco Markman Order) at 38-39. Thus, Finjan must identify content received by the Accused Products that includes a call to a substitute function, but cannot do so.

### A.      Background of the '154 Patent

The '154 Patent "affords protection against dynamically generated malicious code." Ex. 2 at 3 (quoting '154 Patent, 4:32-34). As the Court explained, a potential security problem is that a function call having an "input" may not appear malicious when it arrives (*i.e.*, before the content is run), but the input will be used to "dynamically generate[] malicious code" at run-time. To solve this problem, the '154 Patent replaces the call to the <u>original function</u> (*i.e.*, the function call in the code that originally arrived at the gateway) with a call to a <u>substitute function</u>. *Id.* at 38; Ex. 1 at 4, 7. After this call to the substitute function is added into the code, the file is sent to the client computer. When the client computer invokes (*i.e.*, "calls") the substitute function, "[t]he substitute function sends the input to a security computer, which determines whether it is safe to invoke the original function with the input at a client computer." Ex. 2 at 3. Claim 1 recites that the client computer thus will invoke the original function with the input *only if* the security computer indicates it is safe to do so. This Court explained the '154 invention on page 5 of the Cisco MSJ Order. *See also Palo Alto Nets, Inc. v. Finjan, Inc.*, 752 F. App'x 1017, 1018 (Fed. Cir. 2018) ("the 'first function' is the inspection step in which the content is assessed for safety, and the 'second function' is when, having been deemed safe, the content is actually run."). Thus, claim 1 is written from the perspective of the client computer being protected (*i.e.*, the computer that receives the file after the "call to the substitute function" has been inserted). Claim 1 requires "a content processor (i) for processing content received over a network, the content

including a call to **a first function [***substitute function***]**, and the call including an input, and (ii) for invoking **a second function [***original function, which is different than the first function***]** with the input, only if a security computer indicates that such invocation is safe." It also requires "transmitting the input to the security computer for inspection, when the first function [*substitute function*] is invoked."

## B.      The '154 Accused Products Do Not Infringe the '154 Patent

For all '154 Accused Products, the dispute concerns the application of the claim language, not the operation of the '154 Accused Products. As set forth below, none of the '154 Accused Products receives content including a call to a substitute function, as required by the claim and the agreed claim constructions. Thus, the Court can resolve the issue of literal infringement as a matter of law. The Court can likewise resolve Finjan's DOE theories for the '154 Patent on the same basis, as Finjan has not identified any purported equivalent for the claimed "call to a first function."

The key points about the requirements of the "first function" are as follows. *First*, the Parties stipulated that "first function" means "substitute function". Dkt. 214 at 2. *Second*, in the Cisco MSJ Order, the Court explained the following regarding the "substitute function":

- "[I]n construing 'first function' to mean 'substitute function,' the Court acknowledged that the content received by the 'content processor' includes a call to 'substitute function' – which replaced the 'original function' at the (unclaimed) gateway." Ex. 1 at 7.

- "It is the 'invention' that replaces the 'original' function with a 'substitute' function – not an external factor such as a hacker." *Id.* at 7.

- "[T]he Court's claim construction requires the 'original function' be replaced by the 'substitute function.' To hold otherwise, renders the word 'substitute' in the Court's construction meaningless." *Id.* at 7-8.

### 1.      Literal Infringement

#### a.      The Operation of the '154 Accused Products

None of the '154 Accused Products substitute calls to functions into any content they receive. Gmuender Decl. ¶¶ 6, 8, 10, 11. Nor do any of the '154 Accused Products receive content in which a substitute function has already been substituted. *Id.* Each of the products is addressed below.

<u>Gateway and ES Products</u>. The ES products receive emails that may contain attachments and

1  perform numerous security-related tasks. In certain situations, the email attachments may be sent to

2  Capture ATP for analysis. *Id.* at ¶ 8.  The Gateways operate similarly to the ES products, but ███

3  ████████████████████████████████████████████████████████████████████████████

4  ███████████████████. *Id.* at ¶ 5.  When a Gateway sends packets to Capture ATP, ████

5  ████████████████████████████. *Id.* at ¶ 12. ███████████████████████████

6  ████████████████████████████████████████████████████. *Id.* at ¶¶ 5, 8.

7      Capture Products. Capture Client runs on an endpoint device, instead of a gateway or ES

8  device. Similar to the Gateways and ES products, Capture Client can send files (in this case, from the

9  endpoint) to Capture ATP for analysis. *Id.* at ¶ 10. ████████████████████████████

10 ████████████████████████████████████████████████ *Id.*

11      With respect to Capture ATP alone, Capture ATP analyzes files as they are received. It does

12 not insert any calls to functions (including a call to a substitute function) into files and does not invoke

13 any functions within the received file that perform the security functionality of the claim. As part of

14 its analysis, Capture ATP ██████████████████████████████████████████████████

15 ████████████████████████████. *Id.* at ¶¶ 12-13.

16      In sum, none of the '154 Accused Products receive content in which a call to an original

17 function within that content has been substituted with a call to a substitute function.

18          **b.    Finjan's Expert Testimony Cannot Avoid Summary Judgment**

19      Dr. Medvidovic does not identify any "call to a first function" that is a call to a "substitute

20 function" for any '154 Accused Product. Instead, he identifies a conclusory laundry list of purported

21 "first functions" [substitute functions]. *See* Ex. 3 (Med. Report) ¶¶ 239, 245, 246, 248, 250, 256, 272,

22 293, 313. But none of these purported "first functions" has any specific relationship to the Accused

23 Products. For example, he does not identify any "first functions" created by a SonicWall product that

24 could perform the security functionality of the substitute function. Also, some are not even functions,

25 some are standard JavaScript functions, some are generic descriptions of types of functions, and some

26 are even malicious functions. Overall, there are two basic failures with what Dr. Medvidovic identifies.

27      *First*, Dr. Medvidovic does not identify any call to a function that was substituted into the

28 received content as part of the Accused Systems. Instead, he opines that both the call to the "substitute

function" and the "original function" can exist within the content as originally created. This renders the word "substitute" in the Court's construction meaningless. If whatever Finjan intends to target as the substitute function was present in the content (file) when it was created, it is not a "substitute" function; it is an "original functions" because no substitution occurred. Finjan's infringement analysis ignores the Court's construction and fails as a matter of law, as it did in the *Cisco* case. Ex. 1 at 8-9.

*Second*, nothing Finjan identifies as the "substitute function" performs the security functionality of the claim – *i.e.*, sending the "input" to a security computer for inspection when invoked. Ex. 2 at 3 ("The substitute function sends the input to a security computer, which determines whether it is safe to invoke the original function with the input at a client computer."). This is because, as set forth above, the '154 Accused Products do not use a function within the content being evaluated to transmit the content or any part thereof for analysis. Highlighting this failure is Dr. Medvidovic's identification of *malicious* functions (such as those inserted by a hacker) as purported "first functions" (substitute functions). *See, e.g.,* Ex. 3 ¶¶ 246 (obfuscate or conceal automatic downloads of malware), 247 (attempt to inject malicious HTML and/or JavaScript), 248 (downloading malware), 250 (embedded malicious iframe). Of course, malicious functions cannot be a "substitute function," and the Court has previously rejected this theory. Ex. 1 at 7-9 ("The Court is not persuaded that a hacker's code 'inspects the input' to 'determine if executing the original function with the input violates a security policy' or operate as 'the inspection step.'").

In sum, evaluating Finjan's infringement theories against the agreed claim construction, the '154 Accused Products do not receive "content including a call to a [substitute function], and the call including an input," nor do they have a "transmitter for transmitting the input to the security computer for inspection, when the [substitute function] is invoked." Finjan cannot identify any substitute function call within the content received by the content processor, nor any function that transmits the input to the security computer for inspection when invoked.

Notably, in Finjan's case against Juniper, Judge Alsup cited this Court's construction in granting summary judgment to Juniper. *Finjan, Inc. v. Juniper Nets., Inc.*, 387 F.Supp.3d 1004 at 1010-11 (N.D. Cal. 2019); *Finjan, Inc. v. Juniper Nets., Inc.*, 2019 U.S. Dist. LEXIS 122762, at *4-5 (N.D. Cal. July 23, 2019) (construing "content processor" to mean a processor that processes modified

content). The *Juniper* court specifically rejected Finjan's argument that the received content must merely have two different functions, but need not substitute one for the other. It ruled (consistent with this Court's construction) that the received content *must* contain a call to a substitute function that is substituted into the content. *Juniper,* 387 F.Supp.3d at 1011 ("The claimed 'first function' then clearly involves the 'substitute function,' which sends the content's input to the security computer for inspection once invoked. . . . the substitute function exists only after the original content is modified at the gateway computer."). The Federal Circuit affirmed the *Juniper* Court's ruling of summary judgment of non-infringement. *Finjan, Inc. v. Juniper Nets., Inc.*, 2019 U.S. App. LEXIS 32118, (Fed. Cir. Oct. 9, 2019)

Likewise, both this Court and the *Juniper* Court rejected Finjan's argument that any modification to incoming content at any point by anyone – including insertion of malicious functions by hackers before it enters the claimed system – was sufficient to satisfy the claim language (one of the arguments Finjan makes here). The *Juniper* Court found that such content "ultimately amounts to the *original* content initially received by the claimed system." *Juniper,* 2019 U.S. Dist. LEXIS 122762 at *6-7. Thus, the content in such a scenario "does not involve a substitute function." *Id*. This Court reached the same conclusion (citing the *Juniper* Order). Ex. 1 at 7-8.

### c.     Finjan's "URL Rewriting" Theory

With respect to the ES products, Dr. Medvidovic accuses a "URL rewriting" capability (which is subject to SonicWall's pending motion to strike (Dkt. 300)). URL rewriting allows the ES products to rewrite a URL within an email to be a different URL, before passing the email to its recipient. To be clear, this is different than the "URL rewriting" argument that survived summary judgment in *Cisco*. Here, Dr. Medvidovic alleges that the claimed "content processor" is in the ES products. Ex. 3 ¶ 292. According to the claim, the ES product must receive content over a network, including a call to a first function. The problem is that Dr. Medvidovic identifies the rewritten URL as the alleged "first function," but it is undisputed that it is the *accused ES products* that insert the rewritten URL into the received email. Ex. 3 ¶ 293. Accordingly, the ES products do not *receive* content (*i.e.*, an email) including the call to a "first function," as the claim requires, since the rewritten URL did not exist until the ES product inserted it into a received email. Thus, even if Finjan is correct that a rewritten URL is

a call to a first function (a fact question according to the Court in *Cisco*), Dr. Medvidovic has not set forth any cognizable infringement theory for the URL rewriting capability. He has not identified any "content processor" that receives content including a call to a first function (*i.e.*, the rewritten URL).

### 2.      Doctrine of Equivalents

For each '154 Accused Product, Dr. Medvidovic makes essentially the same conclusory DOE arguments: "[product/combination] perform the same function because they receiving[sic] incoming content inspect the content using [component(s)] for scanning, and proceed with the function calls of[sic] the content is determined safe." Ex. 3 ¶¶ 259, 277, 297, 318. He then argues "[product/combination] perform the same function the same way because they receive incoming content that include[sic] a call to a first function and an input, and [component(s)], for scanning incoming content to determine if the invocation is safe, and [invokes a second function with the input / for invoking the second function with the input]." *Id*. at ¶¶ 260, 278, 298, 319. He provides no purported equivalent for receiving content "including a call to a first function." He provides a purported DOE analysis for the larger "content processor" limitation, but does not provide any equivalent for receiving content including "a call to a first function." Instead, he states that the '154 Accused Products perform the same function the same way "because they receive incoming content that include[sic] a call to a first function . . .". *Id.* Because he has not identified any "first function" for any of the '154 Accused Products (as set forth above), and he has not identified any equivalent, his DOE analysis likewise does not survive summary judgment.

## II.      THE COMBINATION OF SONICWALL'S EMAIL SECURITY PRODUCTS AND CAPTURE ATP CANNOT INFRINGE THE '844, '494, AND '926 PATENTS

### A.      The '844, '494, and '926 Patents Expired in January 2017

Each of the '844, '494, and '926 Patents claims priority to U.S. Patent Application No. 08/790,097 (now U.S. Patent No. 6,167,520), filed on January 29, 1997. Dkt. No. 1-2 ('844 Patent) at 19; Dkt. 1-5 ('926 Patent) at 27; Dkt. 1-8 ('494 Patent) at 3. Thus, each expired on January 29, 2017. 35 U.S.C. § 154. Finjan does not dispute the expiration date of these asserted patents. Ex. 4 (McDuff Report) ¶ 95 (showing 1/29/2017 patent expiration date).

**B.     Capture ATP Was Not Commercially Available for Use With SonicWall's Email Security Products Until February 2017**

Capture ATP was not available for use with any ES product until February 2017. SonicWall's CTO, John Gmuender, testified that Capture ATP was first commercially released in August of 2016 when SonicOS 6.2.6 was released for select SonicWall firewalls. Ex. 5 at 66:8-67:13; *see also* Gmuender Decl. ¶ 7. His testimony is confirmed by other SonicWall employees, including Mr. Shunhui Zhu who is a VP of Engineering and has been responsible for Capture ATP since "the very beginning when it started" in 2016, and documents produced in this litigation. Ex. 6 at 12:15-13:6, 233:22-234:5; *see also* Ex. 7 at 65:1-18; Ex. 8 at 42:19-24; Ex. 9 (SonicWall-Finjan_00016706); Ex. 10 (SonicWall-Finjan_00012901); Ex. 11 (SonicWall-Finjan_00012919-54).

While the release of Capture ATP with select SonicWall firewalls occurred in August 2016, SonicWall's ES products were unable to send content (*e.g.*, email attachments) to Capture ATP until February 2017, when SonicWall Email Security 9.0 was released. ██████████████. The documents confirm this. ███████████████████████████████████████████████

**C.     The Only Accused Sandbox in this Case is in Capture ATP**

Finjan's experts allege that SonicWall developed and deployed Capture ATP in the winter of 2013-2014. However, none of Finjan's experts have any direct knowledge of Capture ATP's developmental history. Ex. 14 at 57:2-59:16; Ex. 15 at 61:17-25; Ex. 16 at 91:8-92:8. Instead, the experts base this assertion on an internal SonicWall document that does not even reference Capture ATP, but references a ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ Ex. 17 ¶ 23, Ex. 18 ¶ 22, and Ex. 3 ¶ 27 (all citing SonicWall-Finjan_00002468 at 2470); *see also* Ex. 19 (SonicWall-Finjan_0876666 - 80). The document itself, however, states that it does not describe the ████████████████████ but describes the mechanism for sending packets from a firewall to another server. Ex. 20 (SonicWall-Finjan_00002468) at 2471; Ex. 21 at 185:24-187:14, 200:9-202:1. This is the same document Finjan cited in its second infringement contentions as purportedly demonstrating that the accused Gateways and ES products had sandboxing functionality – which Finjan referred to as the CloudAV and GRID sandboxes – separate and apart from that provided by Capture ATP. Ex.

22 (Finjan's Second Supp'l Infringement Contentions, Appendix A-1, at 24 (citing SonicWall-Finjan_00002468)). Finjan's counsel told the Court that the purported Cloud AV sandbox was released in 2013 and, based on the same document relied upon by Finjan's infringement experts, had functionality *different* from that provided by Capture ATP. Ex. 23 at 12:4-19, 21:14-22:9; Dkt. No. 215 at 7 (referencing SonicWall-Finjan_00002470, which is pin cite within the document produced at SonicWall-Finjan_00002468). However, the Court struck Finjan's infringement allegations concerning these sandboxes. Dkt. No. 210 at 6 ("To the extent Finjan's second supplemental infringement contentions purport to disclose infringement theories for Gateway and ESA 'alone' that rely on claim limitations met by cloud-based components, such as the CloudAV and GRID sandboxes, such contentions are outside the scope of the amendments permitted in the Court's May 2019 order, and the Court grants SonicWall's motion to strike these contentions"). The Court subsequently denied Finjan's motion to amend its infringement contentions to add the "sandbox contentions" that were struck from their contentions. Dkt. 241 at 4-8.

As a result of the Court's Orders, the *only* sandbox accused of infringement in this case is the sandbox that is part of Capture ATP. Finjan's experts do not identify any evidence that the "sandbox feature" referenced in the cited document included the Capture ATP features accused of infringement, nor do they identify evidence that this sandbox was actually used with any ES product prior to February 2017. Ex. 17 ¶¶ 17-27; Ex. 18 ¶¶ 13-24; Ex. 3 ¶¶ 20-28. Finjan's expert for the '844 and '494 Patents, Dr. Cole, admitted that Capture ATP cannot infringe prior to its release. Ex. 14 at 56:7-9. Because the only evidence demonstrates that the ES products were not used in with Capture ATP until after the '844, '494, and '926 Patents expired in January 2017, the combination of the ES products with Capture ATP cannot infringe the '844, '494, and '926 Patents.

## III.   SONICWALL GATEWAYS DO NOT RECEIVE "DOWNLOADABLES"

Finjan alleges that the accused Gateways (which SonicWall refers to as "firewalls") infringe the asserted claims of the '494, '844 and '780 Patents on their own. Claim 10 of the '494 Patent, claims 41 and 43 of the '844 Patent, and claim 9 of the '780 Patent require the receiving or obtaining of a "Downloadable." *See* '494 Patent, cl. 10 ("a receiver for receiving an incoming Downloadable");'844 Patent, cls. 41 and 43 ("[means for] receiving a Downloadable"); and '780 Patent, cl. 9 ("a

8

communications engine for obtaining a Downloadable"). However, the accused Gateways never receive or obtain a "Downloadable" and thus do not infringe these claims.

The Court construed "Downloadable" as an "executable application program, which is downloaded from a source computer and run on the destination computer." According to Finjan's experts, an executable application program is a program that can execute or be run on a computer. Ex. 14 at 69:17-70:6; Ex. 15 at 86:13-87:23. Finjan's experts also admit that to be "executable," content must be able to actually execute, run, or perform a function on a system, *i.e.*, it must be structured "in a certain way so that it can be executed." Ex. 14 at 69:17-70:6.

The accused Gateways never possess a reassembled file or executable application program. For context, the accused Gateways are typically positioned between the Internet and an internal network that the Gateways protect by providing a number of services, including anti-virus (referred to as "GAV"), anti-spyware, and intrusion prevention ("IPS"). Gmuender Decl. ¶ 3-4. These services rely on SonicWall's patented RFDPI engine. *Id.* ¶ 5. Crucially (and unlike most industry competitors), the RFDPI engine analyzes the data within the IP packets that pass through the Gateways *without* extracting the packet data and reassembling (*i.e.*, reconstructing) a file. *Id.* ¶ 5. These facts are not disputed by Finjan's experts. Ex. 14 at 169:15-19, 171:2-18; Ex. 15 at 129:17-130:11, 176:2-177:21.

The relevant process is as follows. A file is transmitted over the Internet by (1) a sending device splitting the file into multiple IP packets, each of which contains a portion of the bits that comprise the file (*e.g.*, an application program), (2) the sending device then sends each packet over the Internet (the packets can take different routes and arrive out-of-order), and (3) the receiving device (the ultimate destination) extracts the packet data and "reassembles" the file so it can be executed. Ex. 40 at 87:20-93:24; Gmuender Decl. ¶ 3. An IP packet includes an IP header (with source and destination information) and a payload. Gmuender Decl. ¶ 3; Ex. 14 at 47:22-25; Ex. 24 at 142:25-143:19. The payload includes a portion of the application program, but any given IP packet itself is not executable because it does not contain the entirety of the file. To be executable, the payloads of all of the IP packets must be extracted and the file reassembled. Ex. 15 at 233:5-21 (discussing the extraction of an executable file from packets); Ex. 16 at 57:23-59:11. Most of SonicWall's competitors perform this reassembly function at a gateway to analyze the file. SonicWall does not. Rather, SonicWall's patented

approach is to inspect the payload of each packet on a packet-by-packet basis and then send each packet to its destination without extracting the data and reassembling a file. At no point does an accused Gateway ever possess all packets of a file, and thus the Gateways never possess an executable file. Gmuender Decl. ¶ 5; Ex. 21 at 66:10-67:6; Ex. 24 at 136:10-137:5. Accordingly, the accused Gateways do not receive or obtain the "Downloadable" required by claims 10 and 14 of the '494 Patent, claims 41 and 43 of the '844 Patent, and claim 9 of the '780 Patent.

Finjan's experts do not set forth any DOE allegations for the receiving/obtaining limitations of these patents. Ex. 17 at pp. iii-iv, ¶¶ 547-554, 858-866 (Elements 41(b) and 43(b) of '844 Patent), p. v, ¶ 1146-1153 (Element 10(b) of '494 Patent); Ex. 18 ¶¶ 102-105 (Element 9(b) of '780 Patent).

## IV.    NON-INFRINGEMENT OF '633 AND '822 PATENTS

### A.    Background of the '633 and '822 Patents.

The '633 and '822 Patents share the same specification directed to protecting user devices from malicious mobile code (*e.g.*, Java[TM] applets) downloaded from the Internet. Dkt. 1-6 ('633 Patent) at Abstract; 2:20-33. When a user device requests to download information ("downloadable-information") from a server on the Internet, a protection engine (located between the user device and the server) receives that downloadable-information and determines whether it includes executable code. If so, the protection engine creates a "sandboxed package" with (i) the downloadable-information and (ii) "mobile protection code" (MPC). *See id.* at FIGs. 1a, 1b, 1c, 9; 10:66-11:35. The protection engine then transmits the sandboxed package to the user device, which executes the MPC to monitor or intercept any malicious operations that occur during execution of the downloadable-information. *Id.* at 11:19-35.

### B.    Capture ATP Does Not Use or Transmit MPC ('633 Patent, Claims 1, 8 and 14; '822 Patent, Claim 9)

Finjan accuses Capture ATP alone and in combination with the Gateways, ES products, and Capture Client of infringing these patents, but relies only on Capture ATP for the MPC limitation. Because Capture ATP does not satisfy the MPC limitation, none of the Accused Products infringes.

#### 1.    Literal Infringement

Per the Court's construction, MPC must (a) be executable and (b) at runtime monitor or

10

intercept code operations of the downloadable-information. Ex. 2 at 38. Finjan accuses three Capture ATP features of constituting MPC: (i) ██████████████████████████████████████; (ii) ██████████████████; or (iii) ████████████████████████. As a matter of law, none can be MPC.

*First*, Capture ATP does not use a ██████████. *See* Gmuender Decl. ¶14. Finjan cites no source code in support of its allegations that Capture ATP uses a ██████████. Likewise, the documents on which Finjan's expert relies do not reflect Capture ATP. *See id.* at ¶15.  Second, ████████████████ ██████████████████████ do not operate at runtime to monitor or intercept code operations of the sample being analyzed by Capture ATP. *Id.* at ¶¶ 16-25. ████████████████████████ ████████████████████████████████████████ submitted to Capture ATP are run. *See id.* ¶¶ 17, 23-25. As such, these functions do not even interact with a running sample to be able to monitor/intercept code operations at runtime. *See id.* There is no dispute regarding the operation of this code, and the Court should grant summary judgment on all '633 and '822 Asserted Claims.

Further, claims 1 and 8 of the '633 Patent and claim 9 of the '822 Patent require the transmission of MPC. *See* Dkt. 1-6 ('633 Patent) at claim 1 ("transmitting from the computer mobile protection code"), claim 8 ("causing mobile protection code ('MPC') to be communicated"); Dkt. 1-3 ('822 Patent) at claim 9 (same). Even if ████████████████████████ were MPC (they are not), they are not transmitted in the Capture ATP product. Gmuender Decl. ¶¶ 22, 24, 26. The Court should thus grant summary judgment of non-infringement for these additional reasons.

## 2.    Doctrine of Equivalents

Finjan's infringement expert provides the same DOE analysis for each asserted claim's MPC limitation. Compare Ex. 17 ¶¶ 1593-1596, 1610-1613, 1627-1630, 1644-1647, 1750-1753, 1767-1770, 1784-1787, 1801-1804, 1878-1881, 1895-1898, 1912-1915, 1929-1932, 2052-2055, 2073-2076, 2095-2098. The DOE analysis refers to the "packaging" of some unidentified "code with the downloadable-information to prevent malicious attacks" and "packaging" of some unidentified "instructions that cause a virtual machine or emulation system to spin-up in a malware analysis system to detect and prevent[] attacks by placing it in a protective environment." *See id.* ¶ 1594.

1      *First*, the ████████ does not exist in Capture ATP, and thus cannot be equivalent to MPC.

2    *Second*, Finjan offers no specific DOE theory directed at the accused ████████████

3    ████████. *See, e.g., id.* ¶¶ 1592-1596. Finjan's generic allegations fail as a matter of law

4    because they do not show with particularity how the accused ████████████████████

5    is the equivalent of MPC, *i.e.*, code that is executable and which, at runtime, monitors or intercepts

6    actually or potentially malicious code operations without modifying the executable. *Warner-Jenkinson*

7    *v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n. 8 (1997) (equivalency must be established on limitation-

8    by-limitation basis by "particularized testimony and linking argument").

9        *Third*, one fundamental issue with alleging infringement by these features under DOE is that

10    this code does not execute at the virtual machine in which the sample is run. *See* Gmuender Decl. ¶¶

11    17, 23-25. Therefore, the accused code is incapable of interacting with a running sample, let alone

12    performing something equivalent to runtime monitoring/intercepting of code operations. Indeed, ████

13    ████████████████████████████████████████████████████████

14    ████████████████████████████████████████████████████████

15    ████████████████████████████████████████████ *Id.* ¶¶ 18-21. ████

16    ████████████████████████████████████████████ *Id.* ¶ 23-24. None of

17    these operations can be considered insubstantially different from MPC.

18        Accepting Finjan's DOE theory – that code that does ***no*** runtime monitoring or interception of

19    code operations and does not execute along with the sample producing the code operations is the

20    equivalent of code that does runtime monitoring or interception of code operations – completely

21    vitiates the MPC limitation from the claim. *See Akzo Nobel Coatings, Inc. v. Dow Chemical Co.*, 811

22    F.3d. 1334, 1341-43 (Fed. Cir. 2016) (affirming summary judgment of no DOE infringement where

23    Court's construction required device to "accumulate" dispersion and accused structure allowed

24    dispersion to flow continuously). Therefore, the Court should also grant SonicWall summary judgment

25    of non-infringement of all asserted claims under DOE.

26    **C.**    **Finjan Accuses Combinations in Name Only of Infringing '633 Patent, Claim 14**

27        In an effort to expand the revenue base for damages purposes, Finjan accuses the combination

28    of Capture ATP with each of (i) the Gateways, (ii) the ES products, and (iii) Capture Client of

infringing claim 14 of the '633 Patent. The combination allegations are indistinguishable from the Finjan's Capture ATP *alone* allegations. Claim 14 is directed to a "computer program product" that has a "computer usable medium" with "computer readable program code" that when executed "provid[es] a system" that contains only two "software module" components: (i) an "information re-communicator" and a "mobile code executor". Dkt. 1-6 ('633 Patent) at claim 14. Finjan's combination allegations map both the recited "information re-communicator" and the "mobile code executor" *only* to features of Capture ATP, not to the Gateway/ES/Capture Client products in the combination. Ex. 17 ¶ 1968 (for Gateway+Capture ATP, "*Capture ATP* includes software application module in the form of an information re-communicator [and] … software modules as the mobile code executor…"), ¶ 1984 (same for Email Security+Capture ATP), ¶ 1992 (same for Capture Client+Capture ATP). Finjan makes the identical infringement allegation for Capture ATP only. *See id.* ¶ 1976; *see also id.* Ex. 14 at 216:24-217:22 (confirming identical allegations for accused combinations and Capture ATP only). Therefore, the Court should grant SonicWall summary judgment that the accused combinations do not infringe claim 14.

## V. NON-INFRINGEMENT BASED ON SAME COMPUTER ('305 AND '408 PATENTS)

The asserted claims of both the '408 and '305 Patents require that all claimed steps ('408 Patent) and certain claimed components ('305) be performed by or located within the *same* computer. Finjan asserts that Capture ATP on its own satisfies all elements of the asserted claims. Although SonicWall disputes those allegations, Finjan has properly accused the same computer of satisfying all of the elements so required by the claims. However, in order to bring revenues from Gateway and ES product sales within the ambit of its damages calculation, Finjan also accuses Capture ATP *in combination with* the Gateways and/or ES products. As shown below, a combination of separate, remote computers cannot infringe the asserted claims as a matter of law.

### A. The '408 Patent

The '408 Patent is generally directed to a method of scanning content received by a computer and analyzing that content through the dynamic building of parse trees, in order to determine the existence of malicious code. Both asserted claims (claim 1 and 22) recite steps that must be performed by the *same* computer. Specifically, claim 1 recites "a computer-processor based" method wherein the

first step is "receiving by *a* computer, an incoming stream of program code," and each additional step is performed "by *the* computer" recited in the receiving step. *See also* claim 22 (reciting "program code for causing *a* computer to perform" each of the recited steps). Thus, to satisfy the claims, the same computer that receives an incoming stream of code must also perform each of the additional recited steps. While "a computer" can mean one or more computers, *each* of the one or more computers must perform the recited steps attributed to that computer.

Finjan's Capture ATP plus Gateways theory fails as a matter of law. Specifically, Finjan's expert concedes that while the Gateways perform two of the claimed steps – the receiving step and the determining step – the Gateways do *not* perform the remaining steps (which must be performed by the same computer). Ex. 16 at 193:10-195:11; Ex. 3 ¶¶103; 113; 109; 118; 122; 138; 144; 157; 166. The only way for Capture ATP in combination with Gateways (as opposed to Capture ATP alone) to infringe would be for Capture ATP combined with Gateways to be a single computer. Yet, Capture ATP and the Gateways are separate computers. Indeed, Finjan's expert concedes that Capture ATP is a separate "cloud based service" to which the Gateways – which are "typically deployed between an end user and the Internet" – can send files and from which the Gateways can receive verdicts. Ex. 3 ¶¶ 65, 67 ("████████████████████████████████████████████████████ ████████████████████████"; "files are transferred from Firewalls to Capture ATP"), ¶78.

Finjan's expert further acknowledged that Capture ATP resides on a separate computer from the Gateways when asserting that "Capture ATP, *using its computer*, receives Internet content" and then separately asserted that the "SonicWall Gateway, *also* receives incoming program code," that is then "passed to Capture ATP for further analysis code." Ex. 3 ¶¶ 103, 109. Moreover, logic dictates that if Capture ATP were truly the same computer as the Gateways, Finjan would not have asserted a separate claim of infringement against Capture ATP alone.

The notion that Capture ATP together with a Gateway forms a single computer is also directly contradicted by Finjan's consistent representations to the Court expressly acknowledging that Capture ATP is a wholly separate product from the gateways:

[t]his back and forth where it says the file verdict, that is when you're actually sending a file up to the cloud, and then it, in turn, will send information back based on whatever *sandboxing*

14

1   ***that you do through Capture ATP. That is a separate product. That's as separate service that***
2   ***you pay for***. That's an interaction where you're connecting to the cloud in order to send
3   information up and get information back. You're not – ***when you buy the gateways, from what***
4   ***I understand based on the information we have so far, you don't get that functionality***.
5   Ex. 25 at 28:5-15. Finjan's expert offers no explanation as to how Capture ATP together with a
6   Gateway forms a single computer when they are two different products, sold separately, and where
7   the Gateways do not need Capture ATP to function (and indeed functioned for many years before
8   Capture ATP was launched in 2016 and continue to function without Capture ATP).
9          Finally, Finjan presented no DOE theory for this issue.
10   **B.        The '305 Patent**
11         All asserted claims of the '305 Patent (claims 5 and 6) require several elements be located in
12   the same computer. Specifically, the claims recite a "network interface, ***housed within a computer***,
13   for receiving content from the Internet on its destination to an internet application running ***on the***
14   ***computer***" and "a database of parser and analyzer rules corresponding to computer exploits, stored
15   within ***the*** computer." Thus, the same computer that houses the network interface must also house the
16   recited Internet application and the recited database of parser and analyzer rules.
17         Finjan accuses two "combination" products of infringing these claims: Capture ATP (i) with
18   the Gateways and (ii) with the ES products. For these combinations, Finjan's expert contends that each
19   of Capture ATP, the Gateways, and the ES products have a network interface, but contends (i) the
20   "Internet application" is only on either Capture ATP or a client computer (but not on the Gateways or
21   ESAs) and (ii) the database of parser and analyzer rules is only on Capture ATP. Ex. 3 ¶¶ 179, 183,
22   185, 187. That is, Finjan's expert acknowledges that neither the Gateways nor the ES products have
23   an Internet application. The ***only*** computer Finjan's expert claims houses a network interface, Internet
24   application, *and* a database of parser and analyzer rules is Capture ATP.
25         There can be no dispute that Capture ATP and the Gateways or the ES products are not a single
26   computer that houses a network interface, an Internet application, and a database of parser and analyzer
27   rules, as they must be to satisfy the claims. Capture ATP is a cloud-based service that operates on
28   computers that are completely separate from the Gateways and ES products. As Finjan's counsel

explained to the Court during an October 29, 2019 hearing on Finjan's infringement contentions:

> The way that these products work and what we've accused is we've accused the gateway by itself as it's sold, and then the ESA by itself as it's sold, and then Capture ATP. ***It's a separate product. Separate***, it's sold separately.

Ex. 25 at 22:15-18. Finjan's expert offers no evidence as to how separate computers – one in the cloud and the other at the customer's premises – are the same computer. *See, e.g.*, Ex. 11 at 12920 ("The Firewall is located at the customer's premises, while the Capture ATP server and database are located at a Dell SonicWALL facility."). Because the claims require the network interface, internet application, and database of parser and analyzer rules to be housed in the same computer and the only computer accused of housing all three components is Capture ATP, SonicWall is entitled to summary judgment of non-infringement with respect to Capture ATP with the Gateways and ES products.

## VI.    NON-INFRINGEMENT OF THE '926 PATENT

Finjan has no proof regarding the limitation "a transmitter coupled with said receiver, for transmitting the incoming Downloadable and a representation of the retrieved Downloadable security profile data to a destination computer, via a transport protocol transmission" (the "Transmitter Limitation"). To satisfy that limitation, Finjan must show that within the accused Capture ATP there is (i) a transmitter, (ii) that is coupled with the receiver that received the Downloadable, (iii) that transmits *both* an "incoming Downloadable" and a "representation of the retrieved Downloadable security profile data" (DSP), (iv) to a "destination computer," (v) using a "transport protocol transmission." Finjan's expert offers five theories regarding the Transmitter Limitation. He opines that Capture ATP transmits via a transport protocol the Downloadable and a representation of DSP to (i) a "GRID server" ("First Theory"); (ii) a "sandbox database" ("Second Theory"); (iii) a "known file database" ("Third Theory"); and (iv) a "Cloud Database" (Fourth Theory"). The expert also opines that Capture ATP transmits the Downloadable to the "SonicWall threat team" and the representation of DSP to a "Capture database" ("Fifth Theory"). As a matter of law, none of these theories work.

As an initial matter, Finjan's expert fails to cite any source code to support these five theories, relying instead on mischaracterizations of marketing and planning documents that do not support the theories. For instance, with Finjan's First Theory, Finjan cites a single document showing only an

arrow labeled "malicious files" pointing from "SonicWall Capture Cloud Service" to "SonicWall GRID Data Center &Threat Research Team" along with a statement in a second document that "[m]alicious files are submitted to the SonicWall threat research team for further analysis and to harvest threat information." Ex. 18 ¶ 282 (citing FINJAN-SW 007636-650, SonicWall-Finjan_00976450-976480 at 976453). Even assuming the Threat Research Team (a group of individuals) can properly be considered a "destination computer" (it cannot), the cited "evidence" does not show that (i) DSP data is also sent to a GRID server; (ii) the component that supposedly does the transmitting is coupled with the receiver that receives the Downloadable, or (iii) a transmission protocol is used. *See, e.g.*, *Pharmastem Therapeutics, Inc. v. Viacell, Inc.,* 491 F.3d 1342, 1349 (Fed. Cir. 2007) (Marketing materials are insufficient evidence of infringement when unsupported by evidence of the actual product operation). All technical evidence shows that Capture ATP does not *transmit* malicious files to the Threat Research Team, much less through a transmission protocol. Rather, the evidence shows ███████████████████████████████████████████████. Gmuender Decl. ¶ 28; Ex. 6 at 69:19-70:17.

For Finjan's Second Theory, Finjan cites a graphic showing only that the "results" of the sandbox analyzer are stored in a "database." Ex. 18 ¶ 283. While Finjan also cites SonicWall-Finjan_00002574 claiming it shows that a Downloadable and a representation of DSP are transmitted together, ████████████████████████████████████████████████████████████████████████████████████████████████. Gmuender Decl. ¶¶ 13, 27; Ex. 18 ¶ 284 (citing SonicWall-Finjan_00002574 at 2586-2587). Even accepting as true (for this motion) Finjan's claim regarding what this document shows, and even assuming that a "database" can be considered a "destination computer" (it cannot), Finjan has no evidence that the component that supposedly does the transmission is coupled with the receiver that receives the Downloadable or that a transmission protocol is used. While Finjan's expert notes that Capture ATP communicates with ***other*** SonicWall products (such as firewalls and client computers) by "using UFTP or HTTP protocols" (Ex. 3 ¶ 67), there is no evidence that such transmission protocols are used when components *within* Capture ATP (*e.g.*, the sandbox analyzer) communicate with other components *within* Capture ATP (*e.g.*, a

17

database). Instead, the evidence confirms they are not. Ex. 3 ¶ 68; Gmuender Decl. ¶¶ 12-13, 28.

For Finjan's Third Theory, Finjan cites a single planning document containing a section entitled "Known file database integration," which states "we would like to create a known file database" in which SonicWall would "store the hashes of both known benign files and malicious files." Ex. 18 ¶ 286 (citing SonicWall-Finjan_00002532 at 39). Even if a document discussing SonicWall's plans to create a database were proper evidence regarding the functionality of Capture ATP, and even assuming a "known file database" can properly be considered a "destination computer" (it cannot), there is nothing in this document evidencing that (i) the Downloadable itself is transmitted from Capture ATP to the known file database (as opposed to a hash of the Downloadable); (ii) the component that supposedly does the transmission is coupled with the receiver that receives the Downloadable; or (iii) a transmission protocol is used.

Finjan supports its Fourth Theory with a single document (Ex. 26 (SonicWall-Finjan_00002551-561) at 58-59) which states only that when the sandbox analyzer analyzes a file, it uploads certain records to a cloud database. Even assuming the truth of this statement, Finjan has come forward with no evidence to show that (i) the Downloadable itself is transmitted from Capture ATP to the referenced cloud database; (ii) the component that supposedly does the transmission is coupled with the receiver that receives the Downloadable; or (iii) a transmission protocol is used.

Finjan supports its Fifth Theory with a single page from a single document, which page is headed "Speaker Notes for Slide 4." That page contains one bullet point indicating that "verdict and behavior analysis result stored in Capture database, clean file deleted immediately" and a second bullet point indicating that "[m]alicious file sent to SonicWall threat team for further analysis threat intel harvest." Ex. 18 ¶ 285. Even accepting this page as evidence of Capture ATP's operation, and assuming that a "Capture database' and the "SonicWall threat team" are each a destination computer (they are not), there is no evidence that the component that supposedly does the transmitting is coupled with the receiver that receives the Downloadable or that a transmission protocol is used.

Finally, Finjan's conclusory statements that the accused products perform the same function in the same way to achieve substantially the same results (Ex. 18 ¶¶ 288-291) is insufficient to support a claim under DOE. *Warner–Jenkinson.,* 520 U.S. at 39 n. 8 (requiring "particularized testimony and

1  linking argument" for each prong of the "function, way, result test"). SonicWall is thus entitled to

2  summary judgment on the doctrine of equivalents.

3  **VII.    NON-INFRINGEMENT '305 PATENT**

4          The '305 Patent protects a computer requesting content from the Internet by diverting that

5  content to a scanner that uses parser and analyzer rules to recognize malware. Each asserted claim (5

6  and 6) recites "a network interface, housed within a computer, for receiving incoming content from

7  the Internet *on its destination to an Internet application running on the computer*" and further recites

8  that incoming content is "diverted" from its "intended destination" to a scanner. The claims make clear

9  that the "intended destination" is the Internet application to which the content is sent before it is

10 received at the network interface. SonicWall is entitled to summary judgment of noninfringement

11 because Finjan cannot prove that Capture ATP has "a network traffic probe, operatively coupled to

12 said network interface and to said rule-based content scanner, for selectively diverting incoming

13 content from its intended destination to said rule-based content scanner," as recited in claims 5 and 6,

14 as content is never "diverted" from an "intended destination."

15         Finjan's expert asserts "Capture ATP's ███████████████████████" is the network

16 traffic probe. Ex. 3 ¶ 217. He further asserts the controller server or its Capture Engine causes the

17 incoming content to be selectively diverted from a web browser or email client on either Capture

18 ATP's virtual sandbox or an endpoint client computer – each of which are the purported intended

19 destination – to Capture ATP's ████████████████████ *(i.e.,* Capture ATP's static

20 analysis). Ex. 3 ¶¶ 217-218.

21         As for the theory that files are selectively diverted from the client endpoint to Capture ATP's

22 ███████ (a theory that is subject to SonicWall's pending motion to strike for not having been

23 previously disclosed in Finjan's operative contentions), the undisputed record evidence shows that

24 ████████████████████████████████████████████████████████████████

25 ████████████████████████████████. *See, e.g.*, Ex. 6 at 208:19-209:18 ("The

26 user is getting every package, which is making copy to the backend, to the cloud part, ██████████

27 ████████████████████████████████████████████████████████████████

28 ████████████████████████████████████████████████████████████████

██████████████████████ and… wait[s] for the Capture ATP to device whether it's a good file or bad file."). Similarly, when an ES product receives an email with an attachment, ██████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████, at which point it is either blocked (if bad) or sent to the client computer (if good). Gmuender Decl. ¶ 8.  Content is not "diverted" from the endpoint client computer to ██████████████████, as Finjan's expert concludes, because (i) ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████

Finjan's second theory strains credulity. Finjan argues that Capture ATP's sandbox functionality is the "intended destination" and that files are selectively diverted from Capture ATP's sandbox (supposedly the intended destination) to ██████████████████. But this theory turns the claim on its head. The "intended destination" is the destination to which content (files) is sent *before* the security system intervenes and "selectively diverts" it (via the network traffic probe) to a scanner. Even accepting Finjan's premise that Capture ATP is an "intended destination," files analyzed in Capture ATP are ████████████████████████████. Gmuender Decl. ¶12. There is nothing "selective" about the process – ███████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████. *Id.* As such, files are not "diverted" *from* the sandbox ████████████, because content is not sent to the sandbox; it is sent to ████████████████████████████. And the files are certainly not *selectively* diverted to the pre-filters, as the claims require, ██████████ ██████████████████████████████.

## VIII.   DAMAGES

### A.      Finjan Is Not Entitled to a Royalty on SonicWall's Non-U.S. Sales

SonicWall moves for summary judgment on Finjan's damages claim that is predicated on non-U.S. activity. "It is axiomatic that U.S. patent law does not operate extraterritorially to prohibit infringement abroad." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l., Inc.*, 711 F.3d 1348,

1371 (Fed. Cir. 2013). Thus, the patent laws "do not provide compensation for a defendant's foreign exploitation of a patented invention, which is not infringement at all." *Id.* Here, Finjan's damages expert (Dr. McDuff) has opined that a reasonable royalty is properly calculated "based on SonicWall worldwide sales." Ex. 4 ¶ 8. For two of his methods, Dr. McDuff also presents U.S.-only figure:

| Methods | U.S.-only | Worldwide |
| --- | --- | --- |
| 1. 8/16% X apportioned revenue base (McDuff Table 12) | ███████ | █████████ |
| 2. Per-Unit (McDuff ¶ 146) | ███████ | █████████ |
| 3. Per-Scan (McDuff ¶158) | ███ | █████████ |

Dr. McDuff relies on Finjan's technical experts and counsel to support a claim to royalties on non-U.S. activities. Ex. 27 at 107:23-108:15, 217:24-218:17. Although Finjan's technical reports each include a section regarding alleged evidence of U.S. infringement relating to foreign activity, none of the cited evidence supports a claim of infringement for such activities.

Plaintiff's experts opine that by placing Capture ATP servers in San Jose and Miami, "SonicWall makes it easier to provide the infringing services to foreign customers, including those in North America." Ex. 3 ¶ 327; Ex. 18 ¶ 507; Ex. 17 ¶ 2119. They appear to argue that because SonicWall's North American customers may use Capture ATP servers located within the United States, the use of those servers by such customers constitutes an act of direct infringement, for which SonicWall could be held liable for inducing. This showing is not sufficient to award damages for non-U.S. sales (*i.e.*, sales to customers outside of the U.S.). When a non-U.S. customer submits a file to Capture ATP, it is the customer – not SonicWall – that is making "use" of the claimed system because "direct infringement by 'use' of a system claim requires a party … to use each and every … element of a claimed system." *Centillion Data Sys. v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011). To "use" a system, "a party must … control the system as a whole and obtain benefit from it." *Id.* Use further requires that an "infringer obtain[] 'benefit' from each … element … ." *Int. Ventures I LLC v. Motorola Mob. LLC*, 870 F.3d 1320, 1329 (Fed. Cir. 2017). By causing the Accused System as a whole to perform the claimed act and obtaining the benefit of the result, SonicWall's *customer* – not SonicWall – has "used" the system under Section 271(a). *Centellion*, 631 F.3d at 1285. When the SonicWall customer is located outside the U.S., the customer's "use" of the claimed system

21

occurs outside the U.S., even if part of that system (*e.g.*, a Capture ATP server) is within the U.S. *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005) (use of a system under Section 271(a) is "the place where control of the system is exercised and beneficial use of the system is obtained."). Accordingly, a customer's foreign activity is not direct infringement in the U.S., and SonicWall cannot be liable for inducing such activities.

Finjan's experts also argue that "SonicWall's international customers receive the benefit of signatures generated by Capture ATP in the U.S. and propagated to internation [*sic*] customers." Ex. 3 ¶ 328; Ex. 18 ¶ 508; Ex. 17 ¶ 2120. There is no act of infringement alleged as to "propogat[ing]" signatures to international customers and, therefore, this cannot capture non-U.S. sales.

Finally, Finjan's experts opine "the source code repository for ESA is located in the use [*sic*], further providing evidence that ESA is made in the U.S. and exported abroad." Ex. 3 ¶ 329; Ex. 18 ¶ 509; Ex. 17 ¶ 2121. This is not enough to ensnare non-U.S. sales. Each asserted system claim requires multiple components. Thus, to "make" the accused systems in the U.S., all of the requisite elements of the system must be combined into a system *in the U.S.*. *Centillion*, 631 F.3d at 1288 (defendant must combine all claim elements to "make" a system under § 271(a)). Finjan has no evidence that SonicWall combines all of the elements in the U.S. for any accused products. Compiling source code— which is different than maintaining source code in a "repository" and which is only alleged for the ES products – is only one step in the manufacturing process, and source code by itself is not capable of being combined with other hardware elements. *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 449-50 (2007). Thus, the source code's location cannot be a basis to capture non-U.S. sales.

## B.    Finjan Is Not Entitled to Damages Prior to Actual Notice of Infringement

SonicWall moves for summary judgement on Finjan's claim for damages prior to actual notice of infringement of the '926, '968, '844, '822, and '780 Patents. Even assuming, *arguendo*, that Finjan's discussions with SonicWall's predecessor (Dell) can be imputed to SonicWall, Finjan did not provide Dell with actual notice of infringement by the products Finjan accuses in this case on the dates Dr. McDuff uses for the start of damages. It is Finjan's "burden of pleading and proving at trial that [it] complied with the statutory requirements" of 35 U.S.C. § 287(a). *Maxwell v. J. Baker, Inc.* 86 F.3d 1098, 1111 (Fed. Cir. 1996); *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350,

1366 (Fed. Cir. 2017).  Finjan stipulated that it will not rely on patent marking to prove notice. The start date for any damages owed to Finjan thus begins with actual notice. Dkt. 318. "Actual notice requires the affirmative communication of a specific charge of infringement by a specific accused product or device." *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994). A defendant's knowledge of the patents is not enough: "It is irrelevant … whether the defendant knew of the patent or knew of his own infringement." *Amsted*, 24 F.3d at 187. The focus is "on the action of the patentee." *Id*. Two other courts have granted summary judgment against Finjan on this issue. *See Finjan v. Juniper,* 387 F. Supp. 3d 1004, 1014 (N.D. Cal. 2019); *Finjan v. Eset*, LLC, 17-cv-183-CAB-BGS, Dkt. 699 at 11 (S.D. Cal. Oct. 16, 2019).

### 1.  The '926 Patent

Finjan alleges actual notice on June 10, 2014 (Ex. 4 at p. 83; Ex. 28 (Finjan Third Suppl. Resp. to ROG 6) at p. 2), based on a June 10, 2014 email from Finjan's Ivan Chaperot to Dell's Anthony Peterman. Ex. 30. Mr. Chaperot generally references Finjan's "patent portfolio" and seeks to "initiate a dialogue" regarding "patent licensing and other patent collaborations." *Id*. Finjan does not include a specific charge of infringement of the '926 Patent by a specific accused product. *Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 3173 (Fed. Cir. 2010). Indeed, Finjan's corporate designee confirmed it did not identify any specific Finjan patents as being applicable to any specific Dell product. Ex. 29 at 218:20-219:25. Nor do the other documents Finjan cites in response to SonicWall's interrogatory on this issue. *See* Ex. 28. Thus, SonicWall is entitled to summary judgment of no pre-suit damages for the '926 Patent.

### 2.  The '968 Patent, 822 Patent, 780 Patent, and 844 Patent

Finjan alleges actual notice of infringement of the '968, '822, '780, and '844 Patents on November 25, 2014 (Ex. 4 at p. 83), when it "provided a presentation describing Dell/SonicWall's infringement." Ex. 28 p. 2. The November 25, 2014 presentation vaguely references various products, but it does not include a charge of infringement by the products Finjan accuses in this lawsuit. Ex. 31. Despite its burden, Finjan has not established through its experts or otherwise that the products identified pre-suit are "other models" or "related products" to the now-accused products. Thus, there is no evidence to support such a finding. *See Funai*, 616 F.3d 1357 at 1373 (Fed. Cir. 2010). In fact,

1   the products identified in the November 2014 presentation are completely different from the now-

2   accused products.  *See* Ex. 37 (Finjan acknowledged that its assertions changed in November 2016);

3   Ex. 8 at 175:14-17 ("products that were accused … changed again when the lawsuit was filed."); *Id*.

4   at 209:9-210:1 (SonicWall was "surprised by how much was added" in March 2017).

5       The '968 Patent: The November 2014 presentation identifies SonicWall's CFS as relevant to

6   the '968 Patent. Ex. 31 at Finjan-SW 47907-910. The other documents Finjan cites in response to

7   SonicWall's interrogatory on this issue likewise identify CFS. *See* Ex. 32 at 47938-941 (CFS sold as

8   part of the CGSS software); Ex. 33 at Finjan-SW 47995, 47997; Ex. 34 at SonicWall-Finjan_1044810.

9   After filing this lawsuit, Finjan confirmed it is *not* accusing CFS of infringement. Ex. 35. Instead,

10  Finjan accuses WXA in combination with the Gateways, which is unrelated to CFS. Ex. 18 ¶¶ 18-20,

11  153; Gmuender Dec ¶¶ 28-29.  The Gateways with WXA were available for sale as early as 2012 (Ex.

12  18 ¶19), and Finjan could have identified this combination in the November 2014 presentation (or any

13  subsequent communications), but did not. Finjan never accused the Gateways + WXA of infringing

14  the '968 Patent prior to filing the Complaint. SonicWall is entitled to summary judgment of no pre-

15  suit damages for the '968 Patent.

16      The '822 Patent: The November 2014 presentation identifies CFS as relevant to the '822

17  Patent. Ex. 31 at Finjan-SW 47921-923. CFS is not an accused product. Ex. 35. Otherwise, the

18  screenshots reference GRID Network (marketing term) and Threat Center and Research Labs (group

19  of individuals). *Id*. at Finjan-SW 47924; *see* Ex. 5 at 135:23-136:16. The presentation does not identify

20  the products Finjan now alleges infringe the '822 Patent: Gateways + Capture ATP, ES products +

21  Capture ATP, Capture ATP, and Capture Client. Ex. 17 ¶ 1491. CFS and Capture ATP are different

22  products. Ex. 39 at 14:8-16; Gmuender Decl. ¶¶ 28. Other documents Finjan identified in response to

23  Interrogatory No. 6 likewise do not identity any products (or product groups) now accused. The July

24  8, 2014 claim chart and October 2016 presentation identify only Gateway Anti-Virus and Anti-

25  Spyware software (optional software available on certain appliances) for the '822 Patent. Ex. 36 at

26  Finjan-SW 47948-952; Ex. 33 at 047997. Again, this is different from the now-accused products and

27  combinations.  Gmuender Decl.  ¶¶ 4, 5, 7, 28. March 28, 2017 was the first time Finjan identified the

28  now-accused Capture ATP alone and in combination with the Gateways and ES products for the '822

Patent. Ex. 34 at SonicWall-Finjan_1044810-811. Mr. Garland confirmed these products were not previously identified and were newly accused as of March 28, 2017. *Id*. at SonicWall-Finjan_1044804 ("Green indicates "new" whereas "black" indicates previously identified and discussed (w/Dell)." If Finjan wanted to identify these products prior to March 2017, it could have. In fact, in 2016, Finjan did identify Capture ATP for other patents, but *not* the '822 Patent. Ex. 33 at Finjan-SW 47995. SonicWall is entitled to summary judgment on damages prior to March 28, 2017 for the '822 patent.

The '780 Patent: The November 2014 presentation identifies the "Junk Button" feature of SonicWall's Anti-Spam software as relevant to the '780 Patent. *See* Ex. 31 at Finjan-SW 047915-916. This presentation does not identify the products Finjan now alleges infringe the '780 Patent: Gateways (alone), Capture ATP, Gateways + Capture ATP, and ES products + Capture ATP. Ex. 18 ¶ 15. A claim chart provided on September 17, 2014 identifies only Gateway Anti-Virus and Cloud Gateway Anti-Virus software for the '780 Patent. Ex. 32 at 47942-944. Even assuming the claim chart provided sufficient notice of Finjan's "Gateway only" allegation of infringement, there can be no dispute that Finjan did not provide notice of infringement of the '780 Patent by Capture ATP alone or in combination with the Gateways and/or ES products. Gmuender Decl. ¶¶ 4, 5, 7. Again, in 2016, Finjan did identify Capture ATP for other patents, but *not* the '780 Patent. There are no other references to the '780 Patent and SonicWall products in the pre-suit discussions. SonicWall is entitled to summary judgment of no pre-suit damages for the '780 Patent on Finjan's claims of infringement as to Capture ATP, Gateways + Capture ATP, and ES products + Capture ATP.

The '844 Patent: The November 2014 presentation identifies CFS as relevant to the '844 Patent. Ex. 31 at Finjan-SW 047900-901. CFS is not an accused product. Ex. 35. This presentation does not identify the products Finjan now alleges infringe the '844 Patent: Gateways (alone) and Capture ATP alone and with the Gateways and ES products. Ex. 17 ¶ 138. Finjan first identified Capture ATP for the '844 Patent in June of 2016. Ex. 33 at Finjan-SW 047995; *see also* Ex. 34 at SonicWall-Finjan_01044809. Finjan first identified the ES products as relevant to the '844 Patent on June 8, 2017. Ex. 38 at Finjan-SW 146179. SonicWall is entitled to summary judgment on damages for the '844 Patent as to Capture ATP alone and with the Gateways prior to June 2016 and with the ES products prior to June 8, 2017.

1

2

3    Dated: December 2, 2020

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

*/s/ Nicole E. Grigg*
Nicole E. Grigg (SBN 307733)
Email: NEGrigg@duanemorris.com
**DUANE MORRIS LLP**
D. Stuart Bartow (SBN 233107)
2475 Hanover Street
Palo Alto, CA 94304-1194
Tel.: 650.847.4150
Fax: 650.847.4151

Matthew C. Gaudet (admitted *pro hac vice*)
Email: mcgaudet@duanemorris.com
Robin L. McGrath (admitted *pro hac vice*)
Email: rlmcgrath@duanemorris.com
David C. Dotson (admitted *pro hac vice*)
Email: dcdotson@duanemorris.com
Jennifer H. Forte (admitted *pro hac vice*)
Email: jhforte@duanemorris.com
1075 Peachtree Street, Ste. 2000
Atlanta, GA 30309
Telephone: 404.253.6900

Joseph A. Powers (admitted *pro hac vice*)
Email: japowers@duanemorris.com
Jarrad M. Gunther (admitted *pro hac vice*)
Email: jmgunther@duanemorris.com
30 South 17th Street
Philadelphia, PA 19103
Telephone: 215.979.1000

Attorneys for Defendant
SONICWALL, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| FINJAN LLC., a Delaware Limited Liability Company,<br><br>Plaintiff,<br><br>vs.<br><br>SONICWALL, INC., a Delaware Corporation<br><br>Defendant. | Case No. 5:17-cv-04467-BLF (VKD)<br><br>**[PROPOSED] ORDER GRANTING DEFENDANT SONICWALL INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

1

2

## [PROPOSED] ORDER

3

Defendant SonicWall, Inc.'s ("SonicWall") Motion for Partial Summary Judgment came

4 regularly before this Court.  Upon consideration of all pleadings, papers, and arguments submitted in

5 support of and opposition to the Motion, and good cause appearing therefor, the Court hereby

6 GRANTS SonicWall's Motion for Partial Summary Judgment.

7

8 **IT IS SO ORDERED**

9

10 Dated: _____

11

Honorable Beth Labson Freeman
United States District Court Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28