**DUANE MORRIS LLP**
D. Stuart Bartow (CA SBN 233107)
dsbartow@duanemorris.com
Nicole E. Grigg (CA SBN 307733)
negrigg@duanemorris.com
2475 Hanover Street
Palo Alto, CA  94304-1194
Telephone: 650.847.4150
Facsimile: 650.847.4151

**DUANE MORRIS LLP**
Joseph A. Powers (PA SBN 84590)
Admitted *Pro Hac Vice*
japowers@duanemorris.com
Jarrad M. Gunther (PA SBN 207038)
Admitted *Pro Hac Vice*
jmgunther@duanemorris.com
30 South 17th Street
Philadelphia, PA  19103
Telephone: 215.979.1000
Facsimile: 215.979.1020

Attorneys for Defendant
SONICWALL INC.

**DUANE MORRIS LLP**
Matthew C. Gaudet (GA SBN 287789)
Admitted *Pro Hac Vice*
mcgaudet@duanemorris.com
Robin L. McGrath (GA SBN 493115)
Admitted *Pro Hac Vice*
rlmcgrath@duanemorris.com
David C. Dotson (GA SBN 138040)
Admitted *Pro Hac Vice*
dcdotson@duanemorris.com
Jennifer H. Forte (GA SBN 940650)
Admitted *Pro Hac Vice*
jhforte@duanemorris.com
1075 Peachtree NE, Suite 2000
Atlanta, GA 30309
Telephone: 404.253.6900
Facsimile: 404.253.6901

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| FINJAN, LLC, a Delaware Limited Liability Company,<br><br>Plaintiff,<br><br>v.<br><br>SONICWALL INC., a Delaware Corporation,<br><br>Defendant. | Case No.: 5:17-cv-04467-BLF-VKD<br><br>**DEFENDANT SONICWALL INC.'S MOTION TO EXCLUDE THE TESTIMONY OF FINJAN'S EXPERTS DR. MCDUFF, DR. STRIEGEL, DR. COLE, DR. MITZENMACHER, AND DR. MEDVIDOVIC**<br><br>Date:        February 18, 2021<br>Time:        9:00 AM<br>Courtroom: 3, 5th Floor<br>Judge:       Hon. Beth Labson Freeman |

**REDACTED**

1
2

**TABLE OF CONTENTS**

Page

3   I.   Legal Standard ................................................................................................1

4   II.  The Opinions of Finjan's Damages Expert, Dr. McDuff, Are Methodologically
         Flawed....................................................................................................................1

5
6        A.   Dr. McDuff's Overarching Failure to Discount for the Time Value of Money ..... 2

7        B.   Each of Dr. McDuff's Individual Methodologies Is Methodologically Flawed..... 4

8             1.   Dr. McDuff's Method No. 1 is Methodologically Flawed ........................ 4

9             2.   Dr. McDuff's Method No. 2 is Methodologically Flawed ........................ 7

10            3.   Dr. McDuff's Method No. 3 Is Methodologically Flawed ........................ 8

11  III. Dr. Striegel's "Technical Apportionment" Opinions Are Flawed and Render Dr.
         McDuff's Apportioned Royalty Bases Unreliable............................................................11

12       A.   Overview of Dr. Striegel's Analysis ................................................................. 11

13       B.   Legal Standard ................................................................................................ 13

14       C.   Dr. Striegel Admits He Did Not Attempt To Identify the Incremental Value
              That the Patented Invention Adds to the Accused Products ................................. 14

15
16       D.   Dr. Striegel's Determination of When "Overlap" Exists is Completely
              Arbitrary and Fails to Undertake the Necessary Further Apportionment............. 17

17            1.   Dr. Striegel's Identification of "Top-Level Functions" Is Flawed ........... 17

18            2.   Dr. Striegel's Identification of "Top-Level Functions" Ignores Non-
                   Accused Functionality ................................................................................. 19

19
20            3.   Dr. Striegel Identified "Overlap" If the Patent Provided Merely More
                   Than a "Miniscule" Benefit to a "Top-Level Function" And Failed To
                   Undertake the Necessary Further Apportionment .................................... 20

21
22  IV.  Drs. Cole, Mitzenmacher, Medvidovic, and Striegel's "Opinions" Regarding the
         Historical Relationship Between Finjan and SonicWall....................................................22

23       A.   Factual Background ........................................................................................ 23

24       B.   Expert Testimony on the Finjan-SonicWall Relations is Improper..................... 23

25
26
27
28

i

1

## <u>TABLE OF AUTHORITIES</u>

2

**Federal Cases**

3

*Arista Networks, Inc. v. Cisco Systems, Inc.*, No. 16-cv-00923-BLF, 2018 U.S. Dist.
     LEXIS 228820 (N.D. Cal. June 15, 2018) .............................................................................24

4

5

*Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336 (1961) .....................................5

6

*Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.,* 809 F.3d
     1295 (Fed. Cir. 2015) .................................................................................................... *Passim*

7

8

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) ...............................1, 14, 17

9

*Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1972) ...................................................5

10

*Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201 (Fed. Cir. 2014) ...........................................13

11

*Exmark Mfg. Co. v. Briggs & Stratton Power Products Grp., Inc.*, 879 F.3d 1332
     (Fed. Cir. 2018) ......................................................................................................................22

12

*Finjan, Inc. v. Blue Coat Sys.*, 879 F.3d 1299 (Fed. Cir. 2018) ........................................ *Passim*

13

*Garretson v. Clark*, 111 U.S. 120 (1884) ...................................................................................14

14

*General Elec. C. v. Joiner*, 522 U.S. 136 (1997) .........................................................................17

15

*GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247 (N.D. Cal. Ap. 16, 2014) ..................................17

16

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) ..........................................3

17

*Mag Aero. Indus. v. B/E Aero., Inc.,* 816 F.3d 1374 (Fed. Cir. 2016) ..........................................19

18

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342 (Fed. Cir. 2007).......................13

19

*Prime Media Group, LLC. v. Acer Am. Corp.*, No. 12-cv-05020-BLF, 2015 U.S. Dist.
     LEXIS 7515 (N.D. Cal. Jan. 22, 2015) ....................................................................................24

20

*Regents of the Univ. of Minn. v. AGA Med. Corp.,* 717 F.3d 929 (Fed. Cir. 2013).....................19

21

22

*VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308 (Fed. Cir. 2014)...........................................14, 20

23

**Federal Statutes**

24

35 U.S.C. §271(a) .........................................................................................................................5

25

**Rules**

26

FRE 702 .........................................................................................................................................1

27

28

ii

DEFENDANT SONICWALL, INC.'S  MOTION TO EXCLUDE THE TESTIMONY OF DRS. MCDUFF , STRIEGEL COLE,
MITZENMACHER AND MEDVIDOVIC
CASE NO. 5:17-cv-04467-BLF-VKD

FRE 702(a)..............................................................................................................23

FRE 702(b)..............................................................................................................23

DEFENDANT SONICWALL, INC.'S  MOTION TO EXCLUDE THE TESTIMONY OF DRS. MCDUFF , STRIEGEL COLE,
MITZENMACHER AND MEDVIDOVIC
CASE NO. 5:17-CV-04467-BLF-VKD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that on February 18, 2021 at 9:00 a.m., or on another date determined by the Court, in Courtroom 3, 5th Floor, in the United States District Court for the Northern District of California, San Jose Courthouse, located at 280 S. 1st St, San Jose, CA 95113, Defendant SonicWall Inc. ("SonicWall") will and does move for an order granting this Motion to Exclude the Testimony of Plaintiff Finjan, LLC's ("Finjan") Experts Dr. McDuff, Dr. Striegel, Dr. Cole, Dr. Mitzenmacher, and Dr. Medvidovic.

For the reasons explained below, this Court should exclude the expert opinions and testimony of Dr. McDuff, Dr. Striegel, Dr. Cole, Dr. Mitzenmacher, and Dr. Medvidovic for failure to meet the admissibility requirements of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and Fed. R. Evid. 702.

By this Motion, SonicWall seeks to exclude certain opinions of Finjan's experts pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).  Specifically, SonicWall moves to exclude the opinions of Finjan's damages expert, Dr. McDuff, and the opinions of Dr. Striegel on the issue if apportionment.  SonicWall further moves to exclude certain opinions of Finjan's technical experts Drs. Cole, Mitzenmacher, and Medvidovic.

## I.    Legal Standard

The Court is well-familiar with the general legal standard governing admission of expert opinion and, therefore, SonicWall will not repeat it here.  *See, e.g.*, Ex. 1[1] (Cisco Daubert Order), at 1-2.  Instead, SonicWall cites the case law most applicable to the specific issues presented by SonicWall's motion as it pertains to each methodological failure of Finjan's experts.

## II.    The Opinions of Finjan's Damages Expert, Dr. McDuff, Are Methodologically Flawed

Finjan accuses SonicWall of infringing eight of its web security patents:  U.S. Patent Nos. 6,804,780 ("'780 Patent), 8,141,154 ("'154 Patent"), 6,154,844 ("'844 Patent"), 8,677,494 ("'494 Patent"), 7,613,926 ("'926 Patent"), 7,975,305 ("'305 Patent"), 8,225,408 ("'408 Patent"), 6,965,968 ("'968 Patent").  The products, or combinations thereof, that Finjan's technical experts accuse of infringing each asserted patent are as follows:

| Patent | Accused Product(s) |
| --- | --- |
| '844/ '494 | Gateways; Capture ATP; Gateways + Capture ATP; ESA + Capture ATP |
| '408 | Capture ATP; Gateways + Capture ATP |
| '305 | Capture ATP; Gateways + Capture ATP; ESA + Capture ATP |
| '154 | Gateways + Capture ATP; ESA + Capture ATP; Capture Client + Capture ATP |
| '780 | Gateways; Capture ATP; Gateways + Capture ATP; ESA + Capture ATP |
| '968 | Gateways + WXA |
| '926 | Capture ATP; Gateways + Capture ATP; ESA + Capture ATP |

---

[1] All exhibits are attached to the Declaration of Jarrad M. Gunther.

Finjan's main damages expert (Dr. McDuff) uses three methods to calculate a reasonable royalty for this alleged infringement: (1) Rate x Base, where the rate is 8% for hardware and 16% for software, and the base is SonicWall's allegedly infringing revenue apportioned according to Dr. Striegel's technical analysis; (2) per-unit royalty, where the "unit" is alleged to be those units accused of infringement; and (3) per-scan royalty, where the rate is $0.32 and the base is the number of "scans" allegedly performed by Capture ATP.  Ex. 2 (McDuff Report) ¶ 8(c).  SonicWall first challenges all three of the methods to the extent Dr. McDuff intends to present figures that are not discounted to reflect the time value of money.  SonicWall next challenges each of Dr. McDuff's individual methodologies based on specific failings unique to each method.  Finally, SonicWall separately moves to exclude Dr. Striegel's technical apportionment opinions, which provide the technical basis for Dr. McDuff's apportioned royalty base in Method No. 1.

### A.    Dr. McDuff's Overarching Failure to Discount for the Time Value of Money

For each of his three methods, Dr. McDuff provides "[t]wo separate sets of calculations … to give the finder of fact flexibility in determining the appropriate amount of compensation for the value of alleged infringement: (a) discounting projected sales to the date of this report … (b) discounting past and projected sales to the start of the damages period."  Ex. 2 ¶ 116.  According to Dr. McDuff, however, "an economically reasonable assessment of the reasonable royalty is calculated by treating the *past sales without discounting* and applying a discount factor to projected sales to discount the value to the present day."  *Id.* ¶114.

Dr. McDuff offers several explanations as to why it is appropriate to treat "the past sales without discounting and applying a discount factor to projected sales to discount the value to the present day" (*id*. at ¶114), but none has merit.  Just as Dr. Layne-Farrar did in *Cisco*—which this Court held was improper—Dr. McDuff appears to be crediting Finjan's willfulness allegations in his decision not to discount past sales.  *Id.* at ¶114 (opining that no discount for past sales is appropriate because "it reflects that SonicWall has earned revenue and profits through ongoing infringement over time via Finjan's technology without compensating Finjan"); Ex. 1 at 10 ("The Court agrees with Cisco that Dr. Layne-Farrar's justifications for not applying the time value of money discount is based

solely on the assumption that Cisco willfully infringed Finjan's patents."). Curiously, Dr. McDuff also opines that not discounting past sales " ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ██████ " Ex. 2 at ¶ 114. Yet, the question with respect to a reasonable royalty is what the parties would have agreed to *at the hypothetical negotiation*—which the parties agree would have occurred between 2012-2014—*not* what they would have agreed to in 2021. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) ("The hypothetical negotiation tries, as best as possible, to create the *ex ante* licensing negotiation scenario and to describe the resulting agreement. In other words, if infringement had not occurred, willing parties would have executed a license agreement specifying a certain royalty payment scheme."). Moreover, Finjan's other damages experts have explicitly acknowledged that Finjan's negotiations applied "discounts … for the time value of money." Ex. 1 at 11 (citing Dr. Layne-Farrar's Report).

Because Dr. McDuff's justifications for not applying a discount to past sales lack merit, this Court should find—as it did in *Cisco*—that his damages "opinion lacks proper foundation for concluding that time value of money discount would not have been applied" to the hypothetical negotiations and exclude Dr. McDuff's damages figures that do not apply the time value of money discount to past sales. Ex. 1 at 11. Granting SonicWall's motion on this issue would reduce Dr. McDuff's worldwide damages figures as follows: Method 1: $160 million down to $119 million; Method 2: $30.8 million down to $22.9 million; Method 3: $114 million down to $90.8 million. To be sure, these figures were based on Dr. McDuff's assumption that all ten originally asserted patents are valid and infringed and that Finjan is entitled to a royalty on SonicWall's worldwide sales. Since he filed his report, the parties have stipulated to dismissal of the '633 and '822 Patents. Dkt. 324. Despite calculating per-patent figures for each method, one cannot simply subtract the per-patent damages numbers for the two now-dismissed patents to determine Dr. McDuff's new royalty figure. That is because, as he states, "the royalties for each patent are not entirely additive," "[g]iven that some of the infringing products, specific accused functionality, infringement dates, and expiration

dates may overlap." Ex. 2 ¶ 8(c).  Thus, it is not evident from the face of Dr. McDuff's Report what impact Finjan's dismissal of these two patents has on his damages figures.  Moreover, SonicWall has separately moved for summary judgment as to Dr. McDuff's worldwide figures.  Dkt. 320.

**B.      Each of Dr. McDuff's Individual Methodologies Is Methodologically Flawed**

**1.      Dr. McDuff's Method No. 1 is Methodologically Flawed**

Dr. McDuff's Method 1 "considers the infringing sale and associated revenues using Finjan's historical royalty rates of 8 and 16 percent, applied to a royalty base that is apportioned based on discussion and consideration of the technical expert opinions." Ex. 2 ¶ 8(c).  This method results in a worldwide, undiscounted damages opinion of "approximately $160 million," which Dr. McDuff considers to be the "most reasonable royalty."  *Id.*  Dr. McDuff's unapportioned royalty base is methodologically flawed for the reasons set forth below and should be excluded on this basis alone. To apportion this royalty base, Dr. McDuff adopts wholesale the technical opinions of Dr. Striegel. Ex. 3 (McDuff Dep.) at 223:25-224:13; *see also id.* at 267:11-19 (confirming that "Dr. Striegel has analyzed the apportionment side of things and I've analyzed the sales data side [of] things").  As discussed separately below, however, Dr. Striegel's apportionment opinions are not tied to the facts of this case and exhibit numerous methodological failings.  Dr. McDuff's apportioned royalty base is thus flawed itself.   Because Dr. McDuff's royalty base (unapportioned and apportioned) is methodologically flawed, the Court should exclude in their entirety his opinions under Method 1.

**a.      Dr. McDuff's Unapportioned Royalty Base Is Not Tied to Finjan's Actual Infringement Theories**

For each patent, Dr. McDuff's unapportioned royalty base contains much more than "the infringing sale and associated revenues," because it fails to take into account that Finjan's infringement allegations largely relate to a specific combination of products, not the individual products themselves.

For example, the only system alleged to infringe the '968 Patent is the ***combination*** of a SonicWall WXA ***with*** a SonicWall Gateway.  ▮▮▮ (Mitz. Report) ¶ 18; ▮▮▮ (Mitz. Dep.) at 72:25-73:14.  According to Dr. McDuff's own calculations, SonicWall has sold ▮▮▮▮▮▮▮▮▮▮

4

DEFENDANT SONICWALL, INC.'S  MOTION TO EXCLUDE THE TESTIMONY OF DRS. MCDUFF , STRIEGEL COLE, MITZENMACHER AND MEDVIDOVIC
CASE NO. 5:17-cv-04467-BLF-VKD

1    ████████████████████████████████████████  Ex. 3 at 212:14-214:2.  Dr.

2    McDuff has no opinion as to how many of these ████ units have actually been combined with a

3    Gateway into an allegedly infringing system.  Ex. 3 at 211:17-22.  He thus has no opinion as to the

4    revenues earned by SonicWall as to the actual system alleged to infringe the '968 Patent, and the

5    mere sale of components needed to form an infringing combination does not prove direct

6    infringement under §271(a).  *See Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 528 (1972);

7    *see also Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 344 (1961) ("[I]f anything

8    is settled in the patent law, it is that the combination patent covers only the totality of the elements in

9    the claim and that no element, separately viewed, is within the grant.").  Because Dr. McDuff's

10   opinions do not fit what is actually alleged to infringe, Dr. McDuff should not be permitted to offer

11   his opinion that SonicWall would agree to pay Finjan a royalty of $104.7 million ($57.3 million in

12   past royalties plus $47.4 million in projected royalties) just to license the '968 Patent.  *See CSIRO*,

13   809 F.3d at 1302 ("'Where the data used is not sufficiently tied to the facts of the case,' a damages

14   model cannot meet the 'substantive statutory requirement of apportionment of royalty damages to the

15   invention's value.'") (quoting *Summit 6*, 802 F.3d at 1296)).  Indeed, Dr. McDuff conceded it would

16   not be economically rational to pay such a high royalty for such minimal sales.  Ex. 3 at 216:15-

17   217:10.

18        Similar methodological failings exist for each of the other Patents-in-Suit, for which at least

19   a portion of Finjan's infringement assertions require a combination of products.  For each of these

20   patents, Finjan accuses, *inter alia*, Capture ATP in combination with certain other products.  For these

21   patents, Dr. McDuff has not provided any opinions as to the revenues associated with the actual

22   combinations accused of infringement, as opposed to the individual constituent products (which are

23   not individually accused of infringement and which cannot form a claim for infringement).  For

24   example, Dr. McDuff admits that his analysis of the '926 Patent assumed (wrongly) that the "Gateway

25   products sold by themselves are alleged to infringe."  Ex. 3 at 200:1-6.

26        Separately, Dr. McDuff's analysis as to the combinations that require Capture ATP is

27   obviously wrong to the extent it includes revenues generated before Capture ATP was commercially

28

5

available and thus able to be combined with the Gateways and ESAs.  Consistent with Finjan's counsel's statement at the summary judgment hearing admitting that there was no evidence that Capture ATP was available for use with an ESA prior to February 2017, Dr. McDuff conceded that the relevant documentation confirms that Capture ATP was not available to be combined into a commercially available system with the Gateways and ESAs until at least August 1, 2016 and February 2017, respectively.  Ex. 3 at 201:5-9, *see also id.* 131:11-133:23; Ex. 6 (gateways); Ex. 3 at 201:10-203:8; Ex. 7 (ESAs).  It is axiomatic that sales of gateways and ESAs prior to these dates cannot infringe, given that Finjan's infringement allegations require these products be combined.  Nevertheless, Dr. McDuff's unapportioned royalty base for each of these patents includes tens of millions of dollars of individual Gateway and ESA sales revenues prior to these dates.  *See*, *e.g.*, Ex. 2 at Attachment D-1 – D-17.  Moreover, even after the release of Capture ATP, because Dr. McDuff assumed that the Gateways and ESAs themselves separately infringed each patent, he has not provided any opinion as to which (or how many) Gateways or ESAs have actually been combined with Capture ATP into an allegedly infringing system.  Therefore, his royalty base, which includes revenues for individual gateways and ESA sales (as well as various software bundles, such as GAV/IPS, CGSS, and AGSS), is not tied to the combination actually alleged to infringe.

For at least these reasons, Dr. McDuff's unapportioned royalty base is not tied to the facts of this case.  This flaw alone warrants exclusion of Dr. McDuff's Method 1 opinions.

> **b.     Dr. McDuff's Wholesale Adoption of Dr. Striegel's Apportionment Opinions Renders His Apportioned Royalty Base Methodologically Flawed**

While Dr. Striegel's analysis suffers from multiple, independently disqualifying flaws (as discussed below), it is also the case that Dr. McDuff's wholesale adoption of those opinions introduces additional flaws that separately warrant exclusion of Dr. McDuff's damages opinions.  For example, Dr. Striegel admitted that in many instances the top-level functions that he identified are actually only available if a customer purchases a separate, optional add-on subscription.  As to the Gateways, for example, 7 of Dr. Striegel's 12 top-level functions are not present on the Gateways at the time of sale, but rather require the purchase of additional, separate add-on software subscriptions,

such as GAV/IPS, CGSS, AGSS, or Capture ATP.  Ex. 8 (Striegel Dep.) at 178:2-184:18.  Indeed, of the 6 of 12 top-level functions that Dr. Striegel identified as overlapping with the Patents-in-Suit for the Gateways, only the "RFDPI Engine" heading does not indicate the need for an added subscription. *Id.*; *see also* Ex. 9; Ex. 10.  That many of his "top-level functions" require separate, add-on subscriptions was not noted anywhere in Dr. Striegel's report and, indeed, it appeared that this fact only became known to him under questioning at his deposition.  Ex. 8 at 178:2-184:18.  Thus, Dr. Striegel did not note the subscription issue anywhere in his Report, and at his deposition instead punted how this might affect damages to Dr. McDuff.  *Id.* at 186:7-22.  Dr. McDuff, however, did not take this fact into account at all.  Instead, he adopted wholesale Dr. Striegel's apportionment factors, which results in a severe and improper inflation of his apportioned royalty base, as it double counts these features.  This wholesale adoption of Dr. Striegel's apportionment opinions—which are themselves methodologically flawed—renders Dr. McDuff's own opinions methodologically flawed and subject to exclusion.

### 2.      Dr. McDuff's Method No. 2 is Methodologically Flawed

Method 2 is "based on the per-unit royalty according to the number of units sold by SonicWall and comparable SonicWall licenses relating to the claimed subject matter."  Ex. 2 ¶ 8(c).  To determine the royalty base for this method, Dr. McDuff looked to "the data that SonicWall produced on units sold of each of the accused SKUs during each year of the damages period."  Ex. 2 ¶ 141 & Table 9.  In doing so, however, Dr. McDuff engages in a severe case of double-counting.  Specifically, Dr. McDuff counts as a separate "unit" a customer's purchase of optional, add-on software subscriptions for CGSS, AGSS, and GAV/IPS.  *Id.* at Table 9.  These subscriptions account for over ████ of Dr. McDuff's ████████.  *Id.* But there is no dispute that these subscriptions each correspond to (and each must be used with) an already-counted Gateway/ESA, and thus allow a user to access certain additional features and functionality via the Gateway/ESA that they purchased.  By way of example only, and as further discussed below, the data sheet for one of the Gateway products identifies several features, but Dr. Striegel admitted that many of those features require the purchase of a separate, add-on subscription, such as GAV/IPS or CGSS.  Ex. 8 at 178:2-184:18.  Dr. McDuff

1  did not account for this fact in his analysis (either via apportionment or in his count of the allegedly

2  infringing "units") and, therefore, there is no basis to count these software subscriptions as separately

3  infringing "units" for which SonicWall would agree to pay an additional royalty.  Moreover, as

4  discussed above, the majority of Finjan's infringement allegations require multiple products be

5  combined into an infringing system.  But Dr. McDuff has no opinion as to the number of such

6  combination systems, *i.e.*, the "units" that are actually accused of infringement.  Indeed, Dr. McDuff

7  conceded that he did not "focus[] on that level of detail in [his] report" but instead simply assumed

8  that each product itself infringed, by itself, contrary to Finjan's actual infringement allegations.  Ex.

9  3 at 199:7-200:21.

10         Because Dr. McDuff's calculation of "units" is not tied to the facts of the case, and specifically

11  Finjan's actual infringement allegations, the entirety of his "per unit" royalty calculation—*i.e.*, Method

12  2—should be excluded.

13                    **3.      Dr. McDuff's Method No. 3 Is Methodologically Flawed**

14         "'Where the data used is not sufficiently tied to the facts of the case,' a damages model cannot

15  meet the 'substantive statutory requirement of apportionment of royalty damages to the invention's

16  value.'" *Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.,* 809 F.3d 1295, 1302

17  (Fed. Cir. 2015) ("*CSIRO*") (quoting *Summit 6*, 802 F.3d at 1296).  For Method 3—a royalty based

18  on a "per-scan" royalty—Dr. McDuff looked to "the number of accused scans multiplied by an

19  appropriate royalty per scan."  Ex. 2 ¶150.  But because both his "royalty per scan" and the "number

20  of accused scans" opinions are methodologically flawed, this entire damages methodology should be

21  excluded.

22                    **a.      Dr. McDuff's Royalty Rate of ▮▮▮ Per Scan Relies On Dr.**

23                    **Striegel's Flawed Analysis of the ▮▮▮▮ Agreements**

24         Dr. McDuff opines that "the appropriate royalty rate is the price per scan of ▮▮▮" and claims

25  that this amount is supported by the "ranges of pricing for ▮▮▮▮ services that have been paid by

26  Finjan and SonicWall" and "represents evidence of pricing for scans in the cybersecurity industry

27  which both SonicWall and Finjan have used."  Ex. 2 ¶154.  These conclusions are factually

28

                                                          8

1   unsupported and instead are based upon Dr. Striegel's flawed analysis of Finjan and SonicWall's

2   ██████████ licenses.  Ex. 3 at 147:1-6.  Specifically, Dr. Striegel opined that "████████████

3   ████████████████████████████████████████████████████████████████████████████████

4   ████████████████████████████████████" Ex. 11 (Striegel Report) ¶126.  Dr. McDuff's ████/scan

5   calculation is based on this purported pricing for █████████████████.  Ex. 2 ¶ 154 n. 347.  But

6   the actual record evidence shows that neither SonicWall nor Finjan ever paid for, or even obtained a

7   license to, ████████████████.  Instead, they purchased and obtained a license to the *separate*

8   "████████████████████████," which both Drs. Striegel and McDuff admitted was priced at

9   ████ or less per scan (i.e., ████████████/scan figure that Dr. McDuff uses).  Ex. 8 at 33:23-

10  40:18, 41:20-22; Ex. 12; Ex. 13; Ex. 3 at 159:9-163:17.  Dr. Striegel was simply wrong in opining

11  that Finjan and SonicWall had a license to █████████████.  By relying on ████████

12  ████████ pricing (instead of the pricing for ██████████████████, which SonicWall and

13  Finjan actually licensed),  Dr. McDuff calculated a royalty rate that was over- inflated by at least

14  16X, improperly skewing the damages range.  Because his royalty rate analysis is not tied to the facts

15  of record, Dr. McDuff's per scan royalty rate is flawed and his opinions regarding this method must

16  be excluded.  *See CSIRO,* 809 F.3d at 1302 ("[A]s damages models are fact-dependent, a distinct but

17  integral part of the admissibility inquiry is whether the data utilized in the methodology is sufficiently

18  tied to the facts of the case.").

19          **b.      Dr. McDuff's Royalty Base Is Improperly Predicated On His**
                      **Incorrect, Layman's Understanding of a Single Statement In**
20                    **SonicWall's Annual Cyber Threat Reports**

21          Dr. McDuff opined that "[a]n appropriate royalty base is the total number of malware scans

22  by Capture ATP."  Ex. 2 ¶ 151.  Dr. McDuff then identified what he believed to be the "total malware

23  scans from the 'start of damages' period in June 2014 through the last patent expiration date" (*id.* ¶

24  153) based on statements in SonicWall's annual Cyber Threat Reports indicating that SonicWall had

25  collected, *e.g.*, "56 million unique malware samples" in 2017.  *See id.* ¶ 152 and Attachment J-3

26  thereto (notes and sources, citing SonicWall's 2018-2020 Cyber Threat Reports)); Ex. 3 at 109:22-

27  114:12; Ex. 14.  But the number of "unique malware samples" collected by SonicWall in any given

28

1    year as set forth in its Cyber Threat Report is **not** the number of "scans" performed by Capture ATP,

2    and, for at least the following reasons, Dr. McDuff is not qualified to opine that it is.

3         *First*, SonicWall confirmed it does not track the number of "scans" performed by the accused

4    products (including Capture ATP).  Ex. 15 (SonicWall's Resp. to Finjan's ROG No. 5).  Dr. McDuff

5    could not recall SonicWall's interrogatory response confirming this fact.  Ex. 3 at 117:22-25, 121:20-

6    122:15.

7         *Second*, Dr. McDuff does not have the necessary technical expertise that would allow him to

8    calculate (or even approximate) the number of "scans" performed by Capture ATP.  Dr. McDuff

9    admits he has no "formal expertise in computer science" and that he is not rendering any technical

10   opinions in this case.  Ex. 3 at 119:11-120:1.  Dr. McDuff further admits he did not consult with any

11   of Finjan's technical experts to support his non-technical understanding.  *Id.* at 116:2-6.  Nor is his

12   interpretation of a statement in SonicWall's annual Cyber Threat Report a question of economics or

13   damages, which is where Dr. McDuff's expertise resides.  *Id.* at 122:6-123:2.  Simply put, Dr. McDuff

14   is not qualified to opine as to his "understanding" that "a unique malware sample" is "the kind of

15   scans that are performed by Capture ATP." *Id.* at 119:4-10.

16        *Third*, Dr. McDuff's interpretation is directly contradicted by his opinions on other matters.

17   For example, Dr. McDuff, citing to third-party market research firm Gartner, opined that SonicWall

18   did not have a sandboxing technology (Capture ATP) in the market until 2016.  Ex. 2 ¶ 13 ("In 2015,

19   Gartner noted that SonicWall did not have sandboxing technology."); Ex. 3 at 131:15-133:23; Ex. 6

20   (admitting Capture ATP was not released until summer of 2016.  It would thus be impossible for at

21   least 172 million of the purported "scans" Dr. McDuff calculated using the Cyber Threat Report from

22   2014-August 2016 to represent "scans" performed by Capture ATP.  Ex. 3 at 123:9-124:18.  Thus,

23   Dr. McDuff's "understanding" as to what the Cyber Threat Reports represented is not only incorrect

24   but it is also unsupported by any technical foundation and contradicted by his own opinions and

25   citations to third party market analysis.

26        This methodology is thus flawed for these reasons alone.  It further is faulty because it relies

27   upon the apportionment opinions of Dr. Striegel (Ex. 2 ¶ 155), which, as discussed further below,

28

10

DEFENDANT SONICWALL, INC.'S  MOTION TO EXCLUDE THE TESTIMONY OF DRS. MCDUFF , STRIEGEL COLE,
MITZENMACHER AND MEDVIDOVIC
CASE NO. 5:17-CV-04467-BLF-VKD

1    suffer from numerous methodological failings.  The Court should thus exclude the entirety of Dr.

2    McDuff's "per-scan" opinions.

3    **III.    Dr. Striegel's "Technical Apportionment" Opinions Are Flawed and Render Dr.**
     **McDuff's Apportioned Royalty Bases Unreliable**

4

5          Dr. Striegel provides a jumble of opinions, none of which should be permitted to be presented

6    to the jury.  Below, SonicWall discusses those opinions on which Dr. McDuff relies to apportion his

7    royalty base.  Specifically, SonicWall challenges: (1) Dr. Striegel's identification of the "top-level

8    functions" that have "equal technical weight" across ten different product groups; and (2) his

9    identification of the "top-level functions" that "overlap with the benefits of the Asserted Patents."

10         **A.     Overview of Dr. Striegel's Analysis**

11         As the first step in his purported technical apportionment analysis, Dr. Striegel groups certain

12   products "into various relevant categories for simplified mapping and descriptions."  Ex. 11 ¶ 87.  Dr.

13   Striegel's product categories—which do not correspond to Plaintiff's actual infringement theories—

14   are: (1) Supermassive/TZ SOHO Appliances/Network Security Appliances ("Gateways"); (2)

15   SonicWave; (3) Advanced Gateway Security Suite ("AGSS"); (4) Comprehensive Gateway Security

16   Suite ("CGSS"); (5) Capture ATP; (6) Gateway Antivirus, Antispyware, Intrusion Prevention,

17   Application Intelligence and Control software bundle; (7); Email Security Appliances and Software;

18   (8) Hosted Email; (9) Capture Client; and (10) WAN Acceleration Appliance ("WXA").  Looking to

19   data sheets or other marketing documents for a product within these groups, Dr. Striegel purports to

20   identify "the top-level functions for each of the particular products that are of equal value from a

21   technical perspective."  *Id.*  From there, Dr. Striegel "determined which top-level functions are

22   attributable to the Asserted Claims of the Asserted Patents" (*id.* ¶111) by determining whether a

23   benefit allegedly provided by an "Asserted Patent" "overlaps" with that "top-level function" (*id.* ¶

24   114).  Appendix D to his Report sets forth in summary fashion each of the product groups, his list of

25   "top-level functions," and a list indicating which "top-level functions" are "attributable to" the

26   patents-in-suit. *See also* Ex. 10.  For his part, Dr. McDuff then adopts this mapping and puts it into

27   percentage form.  For example, because Dr. Striegel opines that the "Gateways" product group has

28

1    12 "top-level functions," five of which are "attributable" to the '844, '494, and '926 Patents, Dr.

2    McDuff applies an apportionment factor of 41.7% (*i.e.*, 5/12) to the revenue from these products.  Ex.

3    2 at Attachment E-1.

4          Giving Finjan the benefit of the doubt, it appears it is attempting to fit Dr. Striegel's analysis

5    within the bounds permitted by the Federal Circuit in *Blue Coat* with respect to Finjan's damages

6    expert's analysis of the '731 and '633 Patents.  *Finjan, Inc. v. Blue Coat Sys.*, 879 F.3d 1299, 1312-

7    13 (Fed. Cir. 2018).  As the Court may recall, during the trial in that case, Dr. Layne-Farrar looked to

8    a Blue Coat architectural diagram that showed 24 boxes representing different parts of the accused

9    system and assumed that each box represented "one top level function and that each function was

10   equally valuable."  *Id*.  And "because one function infringed the '633 patent and three infringed the

11   '731 patent, she used a 1/24th apportionment for the '633 patent and a 3/24th apportionment for the

12   '731 patent."  *Id.* at 1313.

13         Although the Federal Circuit appeared to accept aspects of this methodology under the

14   specific facts of *Blue Coat*, Dr. Striegel actually applies a *different* methodology here, and his analysis

15   here is not supported by any facts.  Specifically, Dr. Layne-Farrar's testimony in *Blue Coat* was

16   supported by the "deposition of a Blue Coat engineer, in which the engineer stated that the diagram

17   … represents the full scope" of the accused product's functionality.  *Id.*at 1313.  No such testimony

18   or other evidence exists here.  To the contrary, the unrebutted testimony in this case establishes that

19   marketing documents, such as those relied on by Dr. Striegel, do not include a complete list of features

20   of the accused products and do not identify the "most important" or "main" features of the accused

21   products. *See* Ex. 29 (Ayrapetov Dep.) at 88:18-89:22; 110:6-111:6; 111:23-113:10; 113:20-114:13;

22   Ex. 30 (Gordineer Dep.) at 33:25-34:16.  Mr. Ayrapetov, SonicWall's VP of Platform Architecture

23   and former Director of Product Management, for example, testified that ████████████████

24   ████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████

26   ██████████████████████ Ex. 29 at 110:16-23.  He further confirmed that

27   these documents oftentimes list as bullet points ████████████████████████

1   ████████████████████████████████   *Id.* at 88:18-89:22.

2           Dr. Striegel did nothing to account for these "table stakes."  Indeed, he admitted that he made

3   no attempt to identify whether or how these other product features—including other non-accused

4   functionality identified in the same documents he relied upon (such as wireless, VoIP, or encryption)

5   would or could map to this "top level functions." Ex. 8 at 157:14-159:6.  Dr. Striegel is a pure

6   academic, with no real world experience purchasing systems like the accused products.  Ex. 11 at

7   Appendix A.  He has no specialized knowledge or expertise relating to analyzing data sheets from a

8   purchasing perspective or regarding the features customers find valuable.  *See, e.g.*, Ex. 8 at 144:4-

9   145:14, 228:5-18. This lack of specialized knowledge underscores the methodological flaws inherent

10  in Dr. Striegel's analysis, as discussed below, and which differentiate it from the *Blue Coat* analysis.

11  *See PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342 (Fed. Cir. 2007) (affirming trial

12  court's exclusion of infringement expert whose opinions were based "entirely on an analysis of

13  defendants marketing materials," and where expert "was not qualified as an expert in marketing or

14  advertising and, in any event, 'her so-called analysis of the defendants' marketing materials was well

15  within the jury's common knowledge, common sense and common experience'").

16          As set forth below, Dr. Striegel's analysis fails to comport with the principles of

17  apportionment.  Accordingly, his opinions—and the opinions of Dr. McDuff that rely on Dr.

18  Striegel's apportionment—must be excluded as methodologically flawed.

19      **B.      Legal Standard**

20          The "Supreme Court made clear that 'when a *patent is for an improvement*, and not for an

21  entirely new machine or contrivance, the patentee must show in what particulars his improvement

22  has *added to the usefulness* of the machine or contrivance. He must separate its results distinctly from

23  those of the other parts, so that the benefits derived from it may be distinctly seen and appreciated.'

24  In other words, the patent holder should only be compensated for the approximate incremental benefit

25  derived from his invention." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1233 (Fed. Cir. 2014)

26  (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).  The Federal Circuit has thus repeatedly held

27  "[w]hen the accused technology does not make up the whole of the accused product, apportionment

28

13

is required." *Blue Coat*, 879 F.3d at 1309; *see also VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) ("No matter what the form of royalty, a patentee must take care to seek only those damages attributable to the infringing features."). "This principle –apportionment – is the governing rule where multi-component products are involved. Consequently, to be admissible, all expert damages opinions must separate the value of the allegedly infringing features from the value of all other features." *CSIRO*, 809 F.3d at 1301 (internal citations omitted).  "Further apportionment" is also required when the even the smallest component contains non-infringing or unpatented elements.  *Blue Coat*, 879 F.3d at 1311.

The Court must be vigorous in exercising its role as a gatekeeper to ensure that the damages analysis ties "proof of damages to the claimed invention's footprint in the market place." *VirnetX*, 767 F.3d at 1327; *see also id.* at 1328 (while "which facts are most relevant for calculating a reasonable royalty are properly left to the jury, a critical prerequisite is that the underlying methodology be sound").  The evidence proffered on apportionment "must be reliable and tangible, and not conjectural or speculative." *Garretson*, 111 U.S. at 121.  Indeed, "given the great financial incentive parties have to exploit the inherent imprecision in patent valuation, courts must be proactive to ensure that the testimony presented – using whatever methodology – is sufficiently reliable to support a damages award."  *CSIRO*, 809 F.3d at 1301 (citing, *inter alia*, *VirnetX*, 767 F.3d at 1328, for proposition that a district court must exercise "its gatekeeping authority to ensure that only theories comporting with settled principles of apportionment were allowed to reach the jury"). Thus, before it can be presented to a jury, the proffered damages testimony – including any technical underpinnings – must meet "'the essential requirement' for reliability under *Daubert*": "'the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product.' In short, apportionment." *Id.* (quoting *Ericsson*, 773 F.3d at 1226).

### C.   Dr. Striegel Admits He Did Not Attempt To Identify the Incremental Value That the Patented Invention Adds to the Accused Products

As a predicate for his technical apportionment opinions, Dr. Striegel first provides a high-level "description" of each of the patents-in-suit and the benefits they allegedly provide.  Ex. 11 ¶¶

14

25-64.  But Dr. Striegel has no basis to describe the alleged benefits of the asserted claims, given his admission that he failed to do what the law requires:  he "did not attempt to identify the incremental value" that the patented invention adds to the end product.  Ex. 8 at 139:14-23.  He further made no effort to isolate the value of the patented improvement found in the accused products or identify the incremental improvement that the patent brings over the prior art.  *Id.* at 139:24-141:2.  Indeed, Dr. Striegel repeatedly confirmed he "was not asked to assess the prior art."  *Id.*  Thus, Dr. Striegel's determination that a product's "top-level function" overlaps or receives a benefit from the patents-in-suit is meaningless as he does not know whether that "benefit" was present in the prior art, conventional, or otherwise disclaimed by Finjan, and further admitted that he did not even know what Finjan was accusing of infringement.

For example, Dr. Striegel found the "top-level function" of receiving network traffic to overlap with the benefits of the '844, '494, and '926 Patents.  *See*, *e.g.*, Ex. 11 ¶ 114.  But transmitting and receiving network traffic is an essential component of ***any*** computer network (including the prior art), and is not a feature attributable to Finjan, something Dr. Striegel admitted. Ex. 8 at 150:4-12.  Attributing such features to Finjan is the exact opposite of what the governing principles of apportionment require.  As another example, Finjan asserts claims 11 and 12 of the '305 Patent, which depend from claim 1, a claim invalidated by the PTO.  Claims 11 and 12 recite only that the internet application of invalid claim 1 is a web browser (Claim 11) or an email client (Claim 12).  Dr. Striegel was completely unaware that Claim 1 had been canceled.  Ex. 8 at 116:25-117:5; *see also* Ex. 16 (cancelling claims 1, 2, 5, and 13).  Remarkably, he claimed that the cancelling of independent Claim 1 would not change his "apportionment" opinions, which gave Finjan full credit to the features of claim 1 held invalid and did not credit either of the limitations of asserted claims 11 or 12.  Ex. 8 at 121:6-122:7; 120:2-20.  In other words, Dr. Striegel's analysis of the benefits provided by the '305 Patent have nothing to do with the claims actually asserted in this litigation.

Dr. Striegel further admitted to having no understanding of the specific product features alleged to infringe and simply assumed infringement of the list of product groups he was provided by counsel.  *See*, *e.g.*, Ex. 8 at 53:8-54:1, 248:18-249:4 (asserting that knowledge of what functionality

1    is accused unnecessary because he "assumed infringement … as a precondition for [his] analysis");

2    67:8-70:6;109:5-111:7 (knowledge of infringement theories unnecessary because he assumed

3    infringement); 135:2-15 (admitting he "did not go into the details of what was necessarily required

4    for infringement"); 292:19-22 (claiming it would have been too much work to "go through and check

5    the box" as to what was actually accused of infringement).   This lack of knowledge as to what is

6    actually accused led him to conclude, for example, that "Content Filtering" is a "top-level function"

7    of the Gateways and AGSS software bundle that maps to a benefit provided by the '968 Patent (Ex.

8    11 ¶¶ 114, 116 and Appendix D thereto); Ex. 10), even though Finjan's counsel admitted that the

9    Content Filtering service is not accused (Dkt. 320 Ex. 35).  It also led him to opine that three "top-

10   level functions" of the "Hosted Email" product overlap with the benefits provided by the '968 Patent

11   (Ex. 11 ¶ 121), even though Hosted Email is not accused of infringing the '968 Patent.  Dr. Striegel's

12   only answer to this incongruity was that he was provided a list of products to analyze by counsel and

13   assumed infringement and validity as part of his apportionment analysis.  Ex. 8 at 290:4-291:14.

14          Relatedly, because Dr. Striegel did not know Finjan's actual infringement theories, he

15   incorrectly assumed that a particular product group infringed by itself, as opposed to in combination

16   with other products. *See, e.g.*, Ex. 8 at 15:6-23:19 ("I assumed infringement.  And so to the extent

17   that it was a specific product or combination of products was immaterial to my technical

18   apportionment."); *see also id.* at 141:13-24, 142:12 ("I looked at each product individually.").  He

19   thus conducted his "top-level function" analysis on products, including software bundles, not

20   individually accused of infringement.  *Id.* at 289:21-294:17.

21          Given that Dr. Striegel (i) has no understanding of the prior art, (ii) does not describe the

22   benefits of the asserted claims over that prior art, (iii) does not address claims actually asserted, and

23   (iv) has no concept of what Finjan actually accuses of infringement, the Court should not permit Dr.

24   Striegel to provide opinions regarding the alleged benefits of the patents-in-suit, as set forth in

25   paragraphs 25-64 of his Report.   Without this threshold understanding of the incremental

26   improvement over the prior art, Dr. Striegel's apportionment analysis lacks the requisite technical

27   predicate.

28
                                            16

1

2

      **D.**    **Dr. Striegel's Determination of When "Overlap" Exists is Completely Arbitrary and Fails to Undertake the Necessary Further Apportionment**

3

4

          Dr. Striegel's apportionment is further flawed for three separate reasons.  First, Dr. Striegel's identification of the "top-level functions" of equal technical value is not based upon any specialized expertise and his reliance on marketing documents results in inconsistent and internally contradictory opinions.  Second, Dr. Striegel ignores additional, non-accused functionality contained within the products.  Third, Dr. Striegel's "top-level functions" contain a multitude of non-accused functionality that should have been, but was not, further apportioned.  Each of these failures renders Dr. Striegel's analysis flawed and subject to exclusion.

5

6

7

8

9

10

          **1.**      **Dr. Striegel's Identification of "Top-Level Functions" Is Flawed**

11

          Dr. Striegel purports to identify the "top-level functions" with equal technical value based on his "expertise and information about the SonicWall products." Ex. 11 ¶ 87.  Dr. Striegel concedes, however, that he identified the "top-level functions" by simply looking at marketing documents for words or phrases appearing in bold font.  *See, e.g.*, Ex. 8 at 147:17-149:5; 194:6-15; 268:21-269:24; 284:14-22; 296:20-297:1; 299:17-300:2; Exs. 9, 10, 17-25.  Viewed from this perspective, it is clear that Dr. Striegel has no explanation for why these features would each have equal technical value and, indeed, other than conclusory references to his "expertise," Dr. Striegel offered no explanation or justification for his conclusions.  He thus failed to provide the requisite foundation for his resulting apportionment opinions. *See General Elec. C. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the lawyer.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").  That there is inevitably "some approximation" in calculating a reasonable royalty "'does not negate the Federal Circuit's requirement of sound economic and factual predicates for that analysis.'" *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, *4 (N.D. Cal. Ap. 16, 2014) (excluding analysis where methodology supported only by expert's "30 years experience").  Plucking bolded features out of marketing documents to conclude that they are all of equal technical value is classic *ipse dixit* that should not

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1     go to the jury.

2          Indeed, because Dr. Striegel's opinions are based on marketing documents, his identification

3     of the "top-level functions" across the product groups is inconsistent.  Specifically, many of the

4     apportionment groups he analyzed consist of software, bundled with other software elements that Dr.

5     Striegel separately analyzed.  For example, for the GAV/IPS product group, Dr. Striegel identified

6     10 "top-level functions."  Ex. 11 ¶ 101.  Yet for the CGSS bundle that Dr. Striegel analyzed, which

7     ***includes*** GAV/IPS (along with the non-accused Content Filtering software and 24/7 support), Dr.

8     Striegel identified only five "top-level functions."  *See id.* ¶¶ 97-98; Exs. 10, 18.  Dr. Striegel does

9     not provide any explanation as to how he identified these 5 "top-level functions" for CGSS beyond

10    them being bolded entries in a data sheet.  Ex. 8 at 209:16-212:11.  Nevertheless, it appears that the

11    GAV/IPS functionality is largely represented by 3 top-level functions, with Content Filtering being

12    a 4th, and the amorphous "Complete Network Solution" being added as a 5th "top-level function."  *See*

13    Ex. 11 ¶¶ 97-98; Ex. 18.  And even though the AGSS bundle includes the same CGSS functionality

14    ***plus*** Capture ATP, Dr. Striegel nevertheless concluded that it, too, only has five "top-level functions."

15    *See* Ex. 11 ¶¶ 95-96; Exs.10, 19.  Dr. Striegel also separately opined that Capture ATP itself consists

16    of 5 "top-level functions."  Ex. 11 ¶¶ 99-100; Ex. 20.  Dr. Striegel was utterly unaware of the nested

17    nature of these software products and, thus made no attempt to correspond, *e.g.*, one or more "top-

18    level function" of one product to one or more "top-level function" of another product.  *See* Ex. 8 at

19    204:2-208:18, 212:18-213:9, 217:2-24; Exs. 18-20; *see also* Ex.10.

20         This failure ultimately leads to several inconsistencies.  For example, Dr. Striegel opined that

21    each of the CGSS and AGSS bundles include the "top-level functions" of "ICSA-certified gateway

22    antivirus and anti-spyware protection" and "Cutting-edge IPS technology." Ex. 11 ¶¶ 95, 97. He

23    determined that only 3 patents (the '844, '494, and '780 Patents) overlapped with these "top-level

24    functions" when analyzing the CGSS software bundle, but when looking at the AGSS bundle, he

25    opined that 8 and 7 patents, respectively, overlapped with these "top-level functions."  *Compare* Ex.

26    10 (charting CGSS), *with id.* (charting AGSS).  That makes no sense, and is emblematic of why the

27    Federal Circuit has rejected the use of marketing documents as proof of technical issues.  *See*, *e.g.*,

28

18

DEFENDANT SONICWALL, INC.'S  MOTION TO EXCLUDE THE TESTIMONY OF DRS. MCDUFF , STRIEGEL COLE,
MITZENMACHER AND MEDVIDOVIC
CASE NO. 5:17-CV-04467-BLF-VKD

*Mag Aero. Indus. v. B/E Aero., Inc.,* 816 F.3d 1374, 1377 (Fed. Cir. 2016) ("[P]romotional and non-technical documents" cannot overcome technical documents describing products.); *Regents of the Univ. of Minn. v. AGA Med. Corp.,* 717 F.3d 929, 939 (Fed. Cir. 2013) (affirming that language of "marketing literature" did not carry same meaning as the same language in claims).

### 2.    Dr. Striegel's Identification of "Top-Level Functions" Ignores Non-Accused Functionality

By looking only for bolded entries, Dr. Striegel ignores—and therefore does not account for—other valuable product features in his apportionment analysis.  For example, Dr. Striegel opines that the products within his Gateways product group have twelve top-level functions.  Ex. 8 at 147:17-149:5 (admitting that the top-level functions that he identified are identical to the headings in the rows in blue starting at Bates page ending in -660); Ex. 9.  Yet the same datasheet on which this opinion is based includes a page titled "Feature summary" that contains twelve *different* bolded headings with bulleted features, which features Dr. Striegel completely ignores.  For example, this page identifies "Wireless," "VoIP," and "SSL/SSH decryption and inspection" as features that Dr. Striegel does not identify as "top-level functions."  Ex. 9 at SonicWall-Finjan_000000663.  Dr. Striegel concedes he did not "dive[] deeply to make a mapping of all of these features" to his "top-level functions," but simply presumed that it could be done (although he made no attempt to do so).  Ex. 8 at 157:14-159:6.  None of the asserted patents relate to the wireless functionality (*e.g.,* MU-MIMO or Beamforming), VoIP functionality or SSL/SSH decryption and inspection (such as deep packet inspection).  *See* Ex. 9 at -663. Indeed, Dr. Striegel admits Finjan did not invent deep packet inspection.  Ex. 8 at 188:13-19 ("I would not say that Finjan invented deep-packet inspection.").  But Dr. Striegel's analysis does nothing to account for this functionality, let alone apportion it out.  Dr. Striegel's failure to account for all of the functionality contained within the products renders his analysis incomplete, flawed, and outside the bounds of *Blue Coat*, in which testimony existed from a Blue Coat engineer confirming that the diagram used represented the full scope of the product's functionality.  *Blue Coat*, 879 F.3d at 1313.

1

2

       **3.**      **Dr. Striegel Identified "Overlap" If the Patent Provided Merely More Than a "Miniscule" Benefit to a "Top-Level Function" And Failed To Undertake the Necessary Further Apportionment**

3

4

5

6

7

8

9

10

11

12

13

14

Dr. Striegel's top-level functions relate to a multitude of (and sometimes consist almost entirely of) non-accused features, but Dr. Striegel did not account for these non-accused features in his apportionment analysis, in contravention of the governing law. *See Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1310-11 (Fed. Cir. 2018) ("Because DRTR is itself a multi-component software engine that includes non-infringing features, the percentage of web traffic handled by DRTR is not a proxy for the incremental value of the patented technology to WebPulse as a whole. Further apportionment was required to reflect the value of the patented technology compared to the value of the unpatented elements."); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014) ("Where the smallest salable unit is, in fact, a multi-component product containing several non-infringing features with no relation to the patented feature (as VirnetX claims it was here), the patentee must do more to estimate what portion of the value of that product is attributable to the patented technology.").

15

16

17

18

19

20

21

22

23

24

25

26

27

By way of just one example, Dr. Striegel identified 4 top-level functions with respect to the SonicWave Access Points product group, based on the headings found on the data sheet page titled "SonicWave Feature Summary." Ex. 21.  He then determined that the '305 and '408 Patents overlap only with respect to the top-level function of "Comprehensive Wireless Security."  Ex. 11 at Appendix D; Ex. 10.  Notably, this same marketing document lists 12 features under the heading of "Comprehensive Wireless Security," but Dr. Striegel's only alleged area of overlap comes, word-for-word, from the first of the 12 features (identified as "Reassembly-Free Deep Packet Inspection technology").  Ex. 8 at 260:17-262:20; Ex. 21.  Dr. Striegel admitted that each of the 12 features under the heading of "Comprehensive Wireless Security" (which he equated to a "top-level function") "may have different values," but he did not make any effort to determine "the specific technical weighting of individual features … to discern whether they were equal technical weight."  Ex. 8 at 263:7-264:23.  He further admitted that he did not render any opinion as to whether any of the Patents-in-Suit have anything to do with the other 11 features under the Comprehensive Wireless Security

28

1
2
3
4
5
6
7
8
9
10

heading.  *Id.* at 265:24-267:22.  In other words, Dr. Striegel admitted that his "top-level functions" contain a multitude of technology that is not accused of infringement, but he did not make any effort to undertake the necessary further apportionment to exclude such unaccused functionality from the royalty analysis.  This problem exists with respect to the entirety of Dr. Striegel's analysis and is evidence on the face of the documents themselves.  *See*, *e.g.*, *id.* at 249:5-251:13; Ex. 9 (testifying that it was "much cleaner" to ignore the specific features identified on the data sheet for the Gateways, and instead look only to the "the blue lines with the white text" that he used to identify the "top-level functions").  The failure to undertake the necessary further apportionment renders his analysis flawed and subject to exclusion.  *Blue Coat*, 879 F.3d at 1310-11 (discussing requirement to further apportion when accused component contains non-infringing functions).

11
12
13
14
15
16
17

Dr. Striegel similarly failed to apportion out features that are included within a top-level function but for which he opined are not technically comparable to the Patents-in-Suit, such as SonicWall's use of McAfee's signature-based malware detection technology.  *See* Ex. 8 at 87:21-88:15 (opining that McAfee's use of traditional signature-based malware detection technology is not technically comparable to the Patents-in-Suit), 280:21-282:15, 288:10-289:20 (admitting that one of his top-level functions includes this same functionality provided by McAfee, but he did not apportion it out).

18
19
20
21
22
23
24
25
26
27

This failure to undertake the necessary further apportionment is also evident with respect to Dr. Striegel's approach to addressing SonicWall's patented RFDPI technology.  Dr. Striegel opines that that the top-level function of RFDPI overlaps with all of the Patents-in-Suit with respect to various of the product groups, including the Gateways (*see* Ex. 11 at Appendix D; Ex. 10—which account for approximately $60 million of Dr. McDuff's $160 million worldwide royalty (*see* Ex. 2 Table 13)).  Dr. McDuff captured 100% of the economic value of that portion of the product group in his apportioned royalty base.  Despite these opinions, Dr. Striegel conceded at his deposition that "DPI would have been around for quite some time" and thus "Finjan did not invent the DPI portion" of SonicWall's RFDPI.  Ex. 8 at 251:15-21.  Dr. Striegel further admitted that none of the Patents-in-Suit "focus on the aspects of doing [DPI] in a manner as espoused by the RFDPI in the sense of

28

21

the reassembly-free version of DPI that SonicWall touts as a top-level feature." In other words, there is no basis for Finjan to include 100% of the value of this "top-level function" in any apportioned royalty base, yet that is exactly what Dr. McDuff (relying upon Dr. Striegel) did.

Similarly, while Dr. Striegel purported to take into account the fact that the RFDPI technology found on the Gateways (and reputation checks technology contained on the ESAs) practices several of SonicWall's patents, in actuality he did no such thing. Ex. 11 ¶ 140. In addressing this issue, Dr. Striegel simply asked himself whether his identified "top-level functionality" would be "superseded or completely interfered with by the SonicWall patents" and determined that they would not. Ex. 8 at 174:13-175:7. He made no effort to otherwise apportion out the functionality that SonicWall has patented, and instead deferred such work to Dr. McDuff. *Id*. at 170:12-173:21. Dr. McDuff, however, simply adopted Dr. Striegel's apportionment analysis wholesale, and, therefore, did not apportion out this functionality. This failure to apportion out the functionality claimed by SonicWall's own patents is another independent reason to exclude Dr. Striegel's analysis. *Exmark Mfg. Co. v. Briggs & Stratton Power Products Grp., Inc.*, 879 F.3d 1332, 1350 (Fed. Cir. 2018) (where alleged infringer owns patents on the accused functionality, the patentee must do more than conclude that these patented "components do not affect the value of the accused mower," because that "amounts to nothing more than speculation. … Without a more detailed analysis, the jury is simply left to speculate or adopt the expert's unsupported conclusory opinion.").

In sum, the multiple failures to engage in the necessary further apportionment renders Dr. Striegel's analysis methodologically flawed and subject to exclusion.

## IV.   Drs. Cole, Mitzenmacher, Medvidovic, and Striegel's "Opinions" Regarding the Historical Relationship Between Finjan and SonicWall

SonicWall moves to exclude certain opinions and proposed testimony from Finjan's experts, Drs. Cole, Mitzenmacher, Medvidovic, and Striegel concerning SonicWall's alleged prior knowledge of Finjan's technology and patents. Each of these experts purports to offer the virtually identical "opinions" regarding SonicWall's purported prior knowledge of Finjan's technology and patents. In doing so, the experts each do little more than simply cite documents produced during the litigation

while providing no testimony regarding the content of these documents that would in any way assist the jury in understanding them.  Their opinions are not based on any scientific, technical, or other specialized knowledge, but are thinly disguised "willfulness" opinions.  What SonicWall knew or believed about Finjan's patents is far afield from technical expertise of these witnesses, as Courts have held in striking such opinions in other Finjan cases.  Indeed, none of these experts have any expertise or particularized knowledge regarding the law of willfulness in patent cases nor have been instructed on the law of willfulness.  Instead, the testimony is the equivalent of lawyer argument that will not assist the trier of fact.  The Court should strike or exclude their testimony on this issue.

### A.    Factual Background

On September 4, 2020, Finjan served the expert reports of Drs. Cole, Mitzenmacher, and Medvidovic—addressing SonicWall's alleged infringement—and the expert report of Dr. Striegel—addressing SonicWall's alleged use of Finjan's technology in the accused products.  Each report includes a section discussing SonicWall's prior knowledge of Finjan's technology and patents.  *See* Ex. 26 (Cole Report) ¶¶ 112-114; Ex. 4 ¶¶ 70-71; Ex. 27 (Medv. Report) ¶¶ 62-63; Ex. 11 ¶ 85.  These sections are substantively the same and cite to many of the same documents, including Wikipedia and news articles, press releases, and email correspondence between the parties.  *Id.* These sections constitute an improper attempt by Finjan to offer a willfulness opinion under the guise of technical expert testimony.  None of Finjan's experts have any legal training, much less training in patent law. Likewise, none have personal knowledge of SonicWall's internal legal evaluation of Finjan's patents or any specialized knowledge or expertise on what SonicWall knew about Finjan's technology or patents. Ex. 26, Appendix A at 1-2; Ex. 4, Appendix A at 1; Ex. 27, Appendix A at 2; Ex. 8, Appendix A at 1; *see also* Ex. 28 (Cole Dep.) at 58:4-59:16; Ex. 4 at 61:17-25.

### B.    Expert Testimony on the Finjan-SonicWall Relations is Improper

Finjan's experts' testimony regarding SonicWall's knowledge of Finjan's technology and patents is not "scientific, technical, or other specialized knowledge [that] will help the trier of fact" under FRE 702(a), nor is it "based on sufficient facts or data" under FRE 702(b).  Instead, Finjan is improperly using the hearsay exception for experts to have its paid witnesses walk through the factual

history and related facts between Finjan and SonicWall, without offering any analysis of the documents to which they cite, and without any first-hand knowledge. Ex. 8 at 51:16-52:4 ("I believe in this particular paragraph [85] I'm merely reciting the history.").

The underlying documents upon which the experts base their opinions—Wikipedia and news articles, press releases, and email correspondence between the parties—are readily understandable by laypersons such that expert testimony regarding those documents is not necessary. Moreover, permitting any one of Finjan's technical experts to testify about the factual background of SonicWall's history with Finjan, including its technology and patents, would be an unfair and prejudicial vouching of evidence, thereby usurping the jury's role and function. *Arista Networks, Inc. v. Cisco Systems, Inc.*, No. 16-cv-00923-BLF, 2018 U.S. Dist. LEXIS 228820, at *10 (N.D. Cal. June 15, 2018) (citing *United States v. Freeman*, 498 F.3d 893, 903 (9th Cir. 2007)); *Prime Media Group, LLC. v. Acer Am. Corp.*, No. 12-cv-05020-BLF, 2015 U.S. Dist. LEXIS 7515, at *21-22 (N.D. Cal. Jan. 22, 2015) (excluding expert testimony that "appears to be simply performing the role of a jury"). The Court should strike these improper opinions as it did in the *Cisco* case. *See* Ex. 1 at 2-3 (excluding testimony where "experts appear to merely set forth a high-level timeline of the relationship and communications between the parties and cite to documents produced in this litigation").

1    Dated:  January 21, 2021                    Respectfully Submitted,

2                                                */s/ Nicole E. Grigg*
                                                 Nicole E. Grigg (formerly Johnson)
3                                                Email: NEGrigg@duanemorris.com
                                                 **DUANE MORRIS LLP**
4                                                2475 Hanover Street
                                                 Palo Alto, CA  94304-1194
5
                                                 Matthew C. Gaudet (*Pro Hac Vice*)
6                                                Email: mcgaudet@duanemorris.com
                                                 Robin L. McGrath (*Pro Hac Vice*)
7                                                Email: rlmcgrath@duanemorris.com
                                                 David C. Dotson (*Pro Hac Vice*)
8                                                Email: dcdotson@duanemorris.com
                                                 Jennifer H. Forte (*Pro Hac Vice*)
9                                                Email: jhforte@duanemorris.com
                                                 1075 Peachtree Street, Ste. 2000
10                                               Atlanta, GA  30309

11                                               Joseph A. Powers (*Pro Hac Vice*)
                                                 Email: japowers@duanemorris.com
12                                               Jarrad M. Gunther (*Pro Hac Vice*)
                                                 Email: jmgunther@duanemorris.com
13                                               30 South 17th Street
                                                 Philadelphia, PA  19103
14
                                                 *Attorneys for Defendant*
15                                               SONICWALL INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2

This is to certify that a true and correct copy of **DEFENDANT SONICWALL INC.'S**

3

**MOTION TO EXCLUDE THE TESTIMONY OF FINJAN'S EXPERTS DR. MCDUFF,**

4

**DR. STRIEGEL, DR. COLE, DR. MITZENMACHER, AND DR. MEDVIDOVIC** was served

5

by ECF on all counsel of record on January 21, 2021.

6

7

*/s/ Nicole E. Grigg*
Nicole E. Grigg

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28